## ANDERSON v. CROW.

(Court of Civil Appeals of Texas. El Paso. Dec. 5, 1912.)

1. BROKERS (§ 86*)—COMMISSIONS—PROCURING CAUSE OF SALE OF REAL ESTATE—EVIDENCE.

Evidence *held* to support a finding that a broker employed to procure a purchaser of real estate was the procuring cause of a sale.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 116–120; Dec. Dig. § 86.*]

2. BROKERS (§ 63*)—COMMISSIONS—FRAUDULENT ACT OF OWNER.

The right of a broker procuring and effecting a sale to his commission may not be defeated by the fraudulent act of the owner in withdrawing the property from the broker prior to the making of a contract.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 79, 81, 94–96; Dec. Dig. § 63.*]

3. BROKERS (§ 86*)—COMMISSIONS—FRAUDULENT ACT OF OWNER—EVIDENCE.

Evidence *held* to support a finding that an owner employing a broker to procure a purchaser of real estate fraudulently withdrew the property from the broker to defeat the right to commission earned by procuring a purchaser and effecting a sale.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 116–120; Dec. Dig. § 86.*]

4. BROKERS (§ 84*)—COMMISSIONS—FRAUDULENT ACT OF OWNER—EVIDENCE.

A fraudulent intent of an owner employing a broker to procure a purchaser of real estate in withdrawing the property from the broker to defeat the right to a commission may be inferred from the surrounding facts; and a fraudulent connivance on the part of the owner and purchaser to defeat the right to commission may be inferred from the fact that the parties took the matter up directly with each other, when both knew of the efforts of the broker to effect a sale, and from the further fact that the purchaser had previously made an effort to eliminate the broker.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 104, 105; Dec. Dig. § 84.*]

5. BROKERS (§ 56*) — COMMISSIONS — WHEN EARNED—EVIDENCE.

Where a broker employed to procure a purchaser of real estate produced several persons willing to purchase, and a sale was made to some of them, the broker had earned his commission.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 85–89; Dec. Dig. § 56.*]

6. LIMITATION OF ACTIONS (§ 46*)—ACTION BY BROKER FOR COMMISSIONS.

A cause of action by a broker for commissions for procuring a purchaser of real estate actually purchasing accrues when the sale is finally consummated.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. §§ 240–253; Dec. Dig. § 46.*]

7. LIMITATION OF ACTIONS (§ 195*)—BURDEN OF PROOF—RECORD.

A defendant has the burden of showing that the cause of action sued on is barred by limitations.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. §§ 711–716; Dec. Dig. § 195.*]

8. APPEAL AND ERROR (§ 909*) — QUESTIONS REVIEWABLE—PRESUMPTIONS.

Where a cause was tried on the second amended petition filed after the running of limitations, in lieu of the first amended petition filed before the running of limitations, and the first amended petition is not in the record, the court, on appeal will not assume that the first amended petition was based on the contract described in the original petition; but since the record fails affirmatively to show that the cause of action was barred the contention that the action was barred must be overruled.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3675; Dec. Dig. § 909.*]

9. APPEAL AND ERROR (§ 742*)—ASSIGNMENTS OF ERROR—PROPOSITIONS.

Assignments of error submitted as propositions, without disclosing the point, as re-

quired by Courts of Civil Appeals rule 30 (142 S. W. xiii), will not be considered on appeal.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3000; Dec. Dig. § 742.*]

**10. TRIAL (§ 252*)—INSTRUCTIONS—IGNORING ISSUES.**

A requested instruction ignoring issues raised by the evidence is properly refused.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 505, 596–612; Dec. Dig. § 252.*]

**11. TRIAL (§ 233*) — INSTRUCTIONS — REQUISITES.**

An instruction properly submitting an issue in a case need not include all the other material issues submitted by other instructions, and the former instruction is not misleading.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 527–530; Dec. Dig. § 233.*]

**12. TRIAL (§ 260*)—INSTRUCTIONS—REFUSAL OF REQUEST.**

Where, in an action for commission for procuring a purchaser, the undisputed testimony showed that the commission should be $1 per acre, and the court in its charge limited the recovery to 50 cents per acre, the refusal of a special charge limiting the recovery to one-half of the contract price was not prejudicial.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 651–659; Dec. Dig. § 260.*]

**13. TRIAL (§ 260*)—INSTRUCTIONS—REFUSAL OF INSTRUCTIONS COVERED BY CHARGE GIVEN.**

Where, in an action by a broker for commission for procuring a purchaser, the court charged that the burden of proof was on plaintiff to establish the fact that he was the procuring cause of the sale by a preponderance of the evidence, and the instructions, in their entirety, indicated the questions to be determined in favor of plaintiff before the jury could find for him, the refusal of a charge that the burden of proof was on plaintiff to prove the material allegations of the petition was not reversible error.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 651–659; Dec. Dig. § 260.*]

**14. APPEAL AND ERROR. (§ 742*) — ASSIGNMENTS OF ERROR — PROPOSITIONS — REQUISITES.**

An assignment of error not supported by a proper proposition, but which merely refers to propositions under another assignment of error, will not be considered.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3000; Dec. Dig. § 742.*]

**15. BROKERS (§ 87*)—COMMISSIONS—ACTIONS—RECOVERY.**

Where a broker's right to a commission for procuring a purchaser was by virtue of his agreement with a third person, who had been employed by the owner to procure a purchaser, and the third person, in writing, had assigned to the broker all interest in his claim for commission against the owner, the broker could recover the entire commission on procuring a purchaser.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. § 131; Dec. Dig. § 87.*]

**16. JUDGMENT (§ 253*)—AMOUNT OF RECOVERY—CONFORMITY TO PLEADING.**

The amount plaintiff may recover is limited by the allegations of the petition.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 443, 444; Dec. Dig. § 253.*]

Appeal from District Court, Harris County; Charles E. Ashe, Judge.

Action by J. W. Crow against John C. Anderson. From a judgment for plaintiff, defendant appeals. Affirmed.

W. W. Anderson and Ed. H. Bailey, both of Houston, for appellant. Maco & Minor Stewart and R. W. Houk, all of Houston, for appellee.

HIGGINS, J. This was a suit by appellee for the recovery of commission alleged to be due by appellant, arising out of the sale of 9,525 acres of land contracted for sale to C. S. Fowler & Bro., of San Antonio, Tex., a firm composed of C. S. Fowler and J. G. Fowler, by written contract dated December 5, 1908, by the terms of which appellant contracted to convey the same to Fowler & Bro., or whomever they might designate. The contract price was at the rate of $16 per acre, and in accordance with the contract the land was conveyed by Anderson to G. W. Gale, J. R. Cottingham, B. L. Nailor, and C. S. Fowler & Bro. by deed dated March 25, 1909. A trial before a jury resulted in a verdict and judgment in favor of appellee for the sum of $4,762.50, with interest from March 25, 1909, from which this appeal is prosecuted.

The material allegations of the petition, briefly stated, are that the land was placed in the hands of J. M. Lee for sale in August, 1907; that by the terms of the agreement between the parties Lee undertook to effect a sale of the land at $15 per acre, or to find, produce, or interest parties in the purchase of same, who would purchase the same at such price or terms acceptable to Anderson, in consideration of which Anderson was to pay Lee the sum of $1 per acre for each acre sold, payable when sale was consummated; that such agency continued up until the sale to Fowler and others was consummated; that Lee associated with himself the plaintiff, Crow, under a partnership agreement, whereby they were to act together in finding a purchaser or effecting a sale and to divide the commission, which agreement was acquiesced in and approved by Anderson; that Crow called the land to the attention of B. L. Nailor and Fowler & Bro., who became interested therein and entered into negotiations for the purchase of same and concluded to purchase same, which fact was communicated to Anderson, and after much delay and negotiation they, in connection with others, did purchase the same; that after Fowler & Bro. became interested in the land they and the defendant conspired together to defraud Lee and Crow out of the commission, and in furtherance of that purpose Anderson pretended to withdraw the land from sale, but, as a matter of fact, he did not withdraw the same, and at the time Fowler & Bro. were negotiating for the land with Anderson and completing arrangements to buy the same; that Lee and Crow found the purchasers to

whom the land was sold, and were the procuring cause by which the sale was made, and would themselves have effected the sale had it not been for the connivance of the defendant and the purchasers. It was further alleged that Lee had assigned his one-half interest in the claim for commission to Crow.

By the first assignment it is urged the court erred in refusing a peremptory instruction for defendant; the contention being that under the pleading and proof the plaintiff, as a matter of law, was not entitled to recover. This necessitates a review of the testimony, which is voluminous, and we will not undertake to state the same in detail, but will confine ourselves to those portions thereof bearing upon the decisive and controverted issues in the case.

In August, 1907, it appears Anderson placed the land for sale in the hands of Lee, who associated Crow with himself upon the terms indicated in the pleadings. They interested Nailor and Fowler & Bro. in the land, and the same was shown to Nailor by Lee and Crow; Nailor, in the inspection, representing himself and Fowler & Bro. The land and price of $15 per acre being satisfactory, the prospective purchasers submitted an offer for the land, the terms of which were by the agents submitted to Anderson, who accepted the same. Thereupon Lee and Crow, in October, 1907, went to San Antonio for the purpose of entering into contract with the purchasers, but after arriving there Fowler & Bro. declined to enter into same, assigning as their reason the condition of the money market, which was then in a serious condition, due to the financial panic of that year. Nailor was willing to consummate the proposal made by them, but, Fowler & Bro. declining to do so, the trade at that time, and for the time being, was dropped by all of the parties. Anderson was advised that these prospective purchasers had been procured by Lee and Crow, and was aware that Crow was co-operating with Lee in endeavoring to sell the land. The land remained for sale in the hands of Lee until it was withdrawn by Anderson by telegram, dated September 24, 1908. After October, 1907, Lee and Crow continued their efforts to sell the land, and on August 20, 1908, they entered into negotiations with J. M. Magill of Bay City, Tex., for the sale of the land at $16 per acre, the price at which they were then authorized to sell the same by Anderson. Magill, being satisfied with the land and price, submitted a proposal to purchase, and Lee and Crow went to Carlinville, Ill., for the purpose of submitting same to Anderson, being there on September 14 and 15, 1908. Anderson declined to accept the terms of purchase proposed by Magill, but submitted a counter proposition through Lee and Crow, which Magill declined to accept, and these negotiations appear to have been dropped about September 24, 1908. After Octo-

ber, 1907, no further effort to purchase the land was made by Fowler & Bro. until about the middle of August, 1908. T. K. Gore, an employé of Fowler & Bro., was acquainted with Anderson, and with his land also, and in August, 1908, at request of C. S. Fowler and in behalf of Fowler & Bro., he wrote Anderson, asking for a price upon the land. In this connection it may be said that the testimony is sharply conflicting upon the issue of whether or not the land was first called to the attention of Fowler & Bro. by Gore, or Lee and Crow, and also as to whether or not the efforts of Lee and Crow were the procuring cause by which the Fowler & Bro. contract of sale was effected, or whether it was due to the activity of Gore in inducing his employers to purchase the same. All of these issues being resolved in favor of Lee and Crow by the jury, we are therefore, in this statement of the facts, making no effort to recite the conflicting evidence bearing thereon, but are stating only those portions which support the jury's finding. Immediately following up the writing of this letter to Anderson by Gore in August, 1908, Fowler & Bro., in person and through Gore, entered into active negotiations for the purchase of the land, both C. S. Fowler and Gore making trips to Carlinville in the conduct thereof; the exact dates of these trips and conferences with Anderson not being shown, but probably before the withdrawal by Anderson of the land from the hands of Lee and Crow. On December 3, 1908, J. G. Fowler went to Carlinville, and there, on December 5, 1908, the contract of sale was entered into.

The uncontradicted testimony shows that after October, 1907, Fowler & Bro. did not thereafter negotiate for the purchase of the land through Lee and Crow; but it is the contention of the plaintiff that he continued his efforts to effect the sale, and continued to urge upon them the advisability of its purchase, and that it was his efforts in the matter which finally resulted in the consummation of the contract of sale, and as supporting this contention we think his testimony sufficient, and quote therefrom as follows:

"I left them two or three days after that [referring to the time when Lee and Crow conferred with Fowler & Bro. and Nailor in San Antonio, in October, 1907, at which time further negotiations were broken off on account of the money panic]. I think on the evening of the 26th of October I left them, and I did not see them any more, because I went North myself then. I did not see them any more until November 16th at San Antonio, and at that time, that date, it was a very disagreeable rainy day, and I arrived in town the night before, and I called them over the phone instead of going to the office. I was stopping at the Hot Wells Hotel, and instead of going to see them, as I had proposed doing, I remained at the hotel on ac-

count of the bad weather, and called them on the phone, and then I stayed over until Monday, and then I saw Mr. Nailor and Mr. Fowler both and renewed the proposition with them, and discussed the situation. Well, of course, at that time in November things had not improved any at all, and the situation remained the same. I did see them after that. I saw them very many times after that. The next time after that I saw them was on the 22d of November. I was in San Antonio on that day, and I asked him whether or not—I mean by 'him' C. S. Fowler. I am referring to C. S. Fowler all the time. I always transacted my business with him, and asked him whether or not things did not look better to him, and we talked the situation over in a general way; and the next day I chanced to be going down in the country, and he was on the train, and we talked over an hour or so about this matter, and, of course, other current events that were happening, talked over the general situation; and the next time I saw him was in January. I spoke of November 22d; that was November 22, 1907, and the next time was January 21, 1908. No; I made a mistake; the 22d was the day in San Antonio, and was the time I saw him on the train. He was going to Alice, and I was going towards Corpus Christi, and we rode together on the train, and we talked over the matter in a general way. That was January 21st. I had just confused the two previous dates. Well, then, on January 27th I was called to San Antonio to consult with them about an extension of time on a payment that was coming due on the property I previously sold them, owing to the bad times. Of course, I was representing Kountz Bros. of New York in that deal, but they called me there for a consultation about getting an extension of time on this payment, and asked me to go to New York, and, of course, at the same time we talked of the Hayes ranch, and I always assumed it was a logical proposition for them to buy it, and they apparently wanted it, and Mr. Fowler never took any other attitude. Always said he wanted the property; that he would like to have it; but, under the circumstances, he said he thought Mr. Anderson was a little stiff in his earnest money. He wanted them to cover up their properties with earnest money, and that seemed to be a thing that was a consideration with them at the time. On March 16th I was in San Antonio, and had a special conference with both Mr. Fowler and Nailor in regard to this property, and March 17, 1908, we talked it over, and Mr. Nailor then renewed his proposition to go ahead, and Mr. Fowler wasn't ready; and on March 17th I arranged with J. G. Fowler—that is, the young man—to show the property within two or three days to some parties they had that they thought might be interested in buying it, and they did not materialize. I did not know who the parties were; but he asked me if I would not show it the coming week, and he would notify me what day he wanted me there. He suggested he would want me to show it to his customers; that was a suggestion of his. August 24th was the next time I had it up with them in San Antonio and with C. S. Fowler. I discussed the advisability of them taking it; for about that time they had practically closed out the 16,000 acres at El Campo, and they were, as a matter of fact, in the market for another proposition. He told me so. That was in August, 1908, the 4th day of August, 1908; and at that time I urged upon him the importance of closing this deal, and working it out, inasmuch as his organization was operating in that neighborhood, and his advertising was running for that neighborhood; that he should close for this property. But he still held off; did not assign any special reason one way or the other; did not say he would not take it, or that he would; just left the matter standing open. As to whether the panic was over or not, or still in existence then, of course, the worst of it was over with; but everybody was still feeling the effects of it. It had hurt the land business very much. The next time I saw him after August 4th in regard to it, on the 7th day of August I spent the day with Fowler again, and another gentleman, in connection with another matter, and, of course, this deal was referred to. I don't think I ever met Fowler during all this time that I did not bring this matter to his attention, and his attitude was he was always friendly towards the proposition; but he never seemingly would come to the point where he wanted to close it. Of course, he talked of hard times and various reasons. At one time I remember he said they had decided to go back to some locality down beyond Alice. They had a lot of land left over down there. And he said they had concluded to go back down there and sell that out after it got to raining. As to what occurred after that, September 8, 1908, I visited with J. G. Fowler in San Antonio, spent most of the day, and I did discuss this deal with him at that time, and his attitude towards the property was always very friendly. He thought they ought to have the property; that they ought to have taken it before they did; but, of course, he said C. S. seemed to think different. That was the 10th of August, 1908, and the other date was the 8th of August, and I saw them the 10th of August. I was at Fowler's office, and spent the day there at the office; and the effort I made at that time to close the deal, just in a general way, we were discussing another proposition and, being with them all day, of course, about what had happened, and the times and conditions were talked over; and we referred to the Edna ranch as one of the propositions we had had up. He did not make me any definite answer on it then. I was with them the day of August 11th also;

spent the entire day with them on that day. On the 11th this deal was referred to incidentally. I never was with them on any occasion during all the time I was meeting them, I never brought this up. I thought it was a proposition they ought to have, and they agreed to take it, and they never called it off. I always expected them to buy it. I could not understand why they did not. It was a mystery to me. The last date I have been talking about was August 11, 1908, and I saw them after that on the 12th of August also, and that night I left San Antonio; and the next time I saw them in regard to it was on December 22d. That was at their office in San Antonio. And I do not recall whether the question was discussed at that time or not. I just called on them briefly on that date. As to when the deal was actually closed by Mr. Anderson to Fowler Bros. by contract, I understand the contract was made November, 1908. That's the information I have. I don't know the date. I never saw the instrument. Yes; I did, during the month of August, 1908, talk with Fowler Bros. in regard to this five times, as I have enumerated. This memorandum I have is just a memorandum of the dates. I am not using it to testify from, just to refresh my memory. This memorandum was not made at the time this transaction occurred. I made it from the daily diary that I keep. I took off the dates. These are some of my annual diaries, and I keep a record every day of what I do, etc., and that is how I happened to be able to give these dates exactly. That is all; otherwise, of course, I couldn't be so exact about it. * * * I never recognized the deal with Fowler Bros. as over; they had never called it off. I never seen any letter from Mr. Fowler saying he had called the deal off. I have seen a letter from Mr. Fowler; but he didn't say that. The letter referred to of November 13th is the letter that Mr. Fowler wrote Mr. Anderson, or Mr. Lee, asking him to eliminate me from the proposition, and take him in and them two handle it and divide the commission; and Mr. Lee sent me that letter to San Antonio. I was there at the time—the day Fowler wrote that letter—and he sent it to Mr. Lee, and Lee forwarded it back to me by return mail, and wrote a letter within a day or so and asked Mr. Fowler to show me what he had written; but Mr. Fowler never showed me the letter. * * *"

Referring to the visit of Lee and Crow to Anderson at Carlinville on 14th and 15th of September, 1908, Crow testified: "I certainly think it would interfere with our carrying out the deal for Mr. Anderson to sell it to our customer without our knowledge and consent. Mr. Anderson certainly knew that Fowler Bros. were our customers. He did know that. We spent a half day—we spent a full day, almost, in conversation with Mr.

Anderson when we were there; and we rehearsed everything that had happened in connection with our efforts to make the sale, and we used it as an argument to get Mr. Anderson to accept the proposition that we were having at that time. We referred to the hard times and the panic that had caused Fowler Bros. not carrying through their deal. That was in September, 1908. We went over all of our transactions with Fowler Bros. and Nailor. We rehearsed the whole thing; spent the afternoon of the first day we were there, and the evening, talking over those matters with Anderson especially. That was the 14th and 15th of September. Mr. Anderson did not tell me Fowler Bros. had been to see him, or had under consideration the purchase of this ranch with him. We discussed with him Fowler and Mossheim and Magill, and those parties where the negotiations had assumed definite form, and where there was a good prospect of making a sale. I did take up the Magill deal and explain it in detail to him. I explained my connection with the Magill deal. * * * When I was in Carlinville, I explained the Magill deal to Anderson just as it was. I told him, of course, Mr. Lee and I were associated. Mr. Lee explained that to start with in introducing me. I was the man that had been associated with him in these deals in the effort to sell this ranch, and we had come for the purpose of presenting another proposition; and during the afternoon and evening, especially at night, we spent some two hours in Mr. Anderson's bank going over what had happened during the past year, all the incidents of the panic that had interfered with our success in closing the sale, and we talked especially over the Fowler matter, because that had been presented to him in the form of a definite proposition; and we went further into explanations on that as to why it was not closed. I told Mr. Anderson in person how the matter had dragged along; that I was disappointed that it was never closed up."

From the foregoing testimony of Crow, it will be noted he continued his efforts to effect a sale to Fowler & Bro. after the failure of the original effort in October, 1907, and these efforts continued up until the month of August, 1908. During the first half of that month he was in San Antonio for a number of days upon different occasions, and repeatedly discussed with Fowler & Bro. the Anderson land, and endeavored to effect a sale thereof to them; and, in considering whether or not his efforts were the procuring cause by which the sale to Fowler & Bro. was effected, it was most significant that it was during this same month, and shortly after Crow's last visit to San Antonio and conference with Fowler, that Fowler, through his employé, Gore, initiated the negotiations with Anderson direct, which finally terminated in his purchase of the land.

[1] Under the facts and testimony detailed above, we think the jury amply sustained in their finding that the efforts of Crow were the procuring cause of the sale. The fact that the negotiations were not conducted through Lee and himself we deem of no importance, under the circumstances, in determining the question of Anderson's liability. The testimony discloses that upon one occasion prior to this time C. S. Fowler had suggested to Lee the elimination of Crow from any participation in the right to the commission. This was denied by Fowler in his deposition; but the untruthfulness of his denial was conclusively shown by the production of his letter to Lee, making the proposal. The testimony of the two Fowlers upon other important issues was likewise shown to be untrue by their letters.

[2-4] As above stated, it is true the sale was not negotiated by Crow and Lee, and the land had been withdrawn from Lee's hands prior to December 5, 1908, when the formal contract of sale was entered into, but these facts do not impair their right to the commission; they having found and produced the purchasers and labored with them to effect a sale, all of which facts were known to Anderson. Their right to the commission could not be defeated by the seller and purchaser entering into negotiations with each other direct, or by the act of Anderson in withdrawing the land from the hands of the agents prior to the making of the contract, if such withdrawal was for the fraudulent purpose of defeating the right of the agents to the commission. Graves v. Bains, 78 Tex. 94, 14 S. W. 256; McDonald v. Cabiness, 98 S. W. 945; Goodwin v. Gunter, 142 S. W. 667. And under all of the circumstances connected with this matter it cannot be said that the finding of the jury that the withdrawal was for such a fraudulent purpose has no support in the evidence. A fraudulent intent of this kind necessarily cannot ordinarily be proven by direct testimony, and it may be inferred and found to exist from all of the surrounding facts and circumstances. A fraudulent connivance upon the part of Anderson and Fowler & Bro. to defeat the right of the agents to their commission may in like manner be inferred, and especially from the fact that the parties took the matter up direct with each other, when both knew of the efforts the agents had been making to effect the sale, and from the further fact that Fowler had theretofore made an effort to eliminate Crow.

[5] We see no merit in the contention that there is a variance between the verbal contract and the correspondence between the parties, and overrule same. We also overrule the contention that there was no evidence showing a contract to pay a commission; neither is there any merit in the contention that a recovery of the commission could not be had, because the testimony shows that the persons to whom Lee and Crow had offered the land were Fowler & Bro. and Nailor; whereas the sale was made to Fowler & Bro. only. All of these parties were found and produced by Lee and Crow, and the fact that the negotiations were with the two parties jointly, whereas the contract of sale was made by Anderson to Fowler & Bro. alone, would not affect their right to a commission.

[6-8] There is no merit in the contention that the cause of action was barred by the two years' statute of limitation. The commission was earned and the cause of action accrued when the sale was finally consummated by execution and delivery of the deed on March 25, 1909. The cause was tried upon a second amended petition, filed April 17, 1911, which upon its face shows that it was in lieu of a first amended petition, filed February 24, 1911. The original petition declared upon a contract alleged to have been made with Crow; whereas the second amended petition alleges, and the proof discloses, a contract with Lee. The burden is upon the appellant to show that the cause of action was barred by limitation; and, the first amended petition not appearing in the record, we are unable to determine whether it declared upon the contract described in the original petition, or upon the contract with Lee. If it declared upon the Lee contract, it was filed within two years after the cause of action accrued, and was therefore not barred by limitation. We will not assume that the first amended petition was based upon the same contract described in the original petition; and, the record failing affirmatively to disclose that the cause of action was barred by limitation, this contention must likewise be overruled.

[9] The second, third, and fourth assignments complain of the action of the trial court in overruling certain exceptions to plaintiff's petition, and the twelfth assignment of the refusal to give a special charge requested by the defendant. They are all submitted as propositions, but as such are insufficient, because they do not disclose the point. See rule 30 for Courts of Civil Appeals (142 S. W. xiii). They are therefore not considered.

[10] Assignments complaining of the refusal of special charges 5, 6, 12, and 15 are overruled. They all entirely ignored the vital issue of whether or not the efforts of Lee and Crow were the procuring cause of the sale; and No. 12 is further defective in ignoring the issue of whether or not Anderson fraudulently withdrew the land from the hands of Lee prior to making the sale.

[11] The ninth assignment is overruled. Under the facts and testimony heretofore quoted, there is ample evidence to show that the efforts of Lee and Crow were the procuring cause of the sale. As to the further objection to the charge that it excluded other

material issues, it is sufficient to say that same properly submitted the important issue of procuring cause; and it was not necessary in that one paragraph to include all of the other material issues in the case. There is no merit in the further contention, under this assignment, that the jury may have been misled by this portion of the charge. .

[12] The tenth and eleventh assignments complain of the refusal of the court to give special charges limiting the right of the plaintiff, Crow, to recover only one-half of the contract price of $1 per acre agreed upon by Lee and Anderson as a commission. The undisputed testimony shows that the commission was to be $1 per acre, and the court in his general charge limited plaintiff's recovery to 50 cents per acre; and we therefore cannot see how appellant could possibly be injured by the refusal of these charges.

[13] The court did not err in refusing a special charge, requested by the defendant, to the effect that the burden of proof was upon the plaintiff to prove all of the material allegations in his petition by a preponderance of the testimony. The determining and controlling issue of liability in this case was whether or not the efforts of Lee and Crow were the procuring cause of the sale, and the court, in his general charge, instructed the jury that the burden of proof was upon the plaintiff to establish this fact by preponderance of the evidence, and the charge of the court, in its entirety, sufficiently indicated the questions of fact to be determined by the jury in favor of plaintiff before they could find in his favor; and it was therefore not reversible error to refuse the special charge of which appellant is here complaining. Blum v. Strong, 71 Tex. 321, 6 S. W. 167; Howard v. Britton, 71 Tex. 286, 9 S. W. 73; Railway Co. v. Dotson, 15 Tex. Civ. App. 73, 38 S. W. 642; Davis v. Davis, 20 Tex. Civ. App. 310, 49 S. W. 727; Kirby v. Estell, 24 Tex. Civ. App. 106, 58 S. W. 254.

[14] The fourteenth assignment is not considered, because unsupported by proper propositions. We are here referred to the first, second, and third propositions under the ninth assignment, and for the reasons stated in San Antonio Foundry Co. v. Drish, 38 Tex. Civ. App. 214, 85 S. W. 440, this is not regarded as a proper method of briefing. Under the fifteenth assignment we are likewise referred to the first, second, and third propositions under the ninth assignment, and for the reasons stated we do not consider these propositions. We do not regard the charge as subject to the criticisms made in the fourth, fifth, and sixth propositions under this assignment, and overrule the same.

Under the sixteenth assignment we are again referred to the first, second, and third propositions under the ninth assignment, and for the reasons indicated we decline to refer to these propositions. As to the fourth and fifth propositions under this assignment, we do not regard the charge subject to the criticism there made; but if so, it is not such an error as would require reversal of the cause at the hands of this court, under rule 62a adopted by the Supreme Court for the government of Courts of Civil Appeals (149 S. W. x), effective November 15, 1912.

The seventeenth assignment is overruled; the criticism of the court's charge here made being regarded as hypercritical.

Assignments 18 to 27, both inclusive, are disposed of by what has been heretofore said, and are overruled.

[15, 16] By cross-assignments of error appellee complains of the action of the trial court in limiting his recovery to a commission of 50 cents per acre. As heretofore stated, the testimony discloses an agency contract between Lee and Anderson, by which Anderson was to pay him a commission of $1 per acre for effecting the sale. There is no privity of contract whatever between Crow and Anderson; Crow's right to a commission being by virtue of his agreement with Lee. Lee, by instrument in writing, transferred and assigned to Crow all of his right, title, and interest in his claim for commission against Anderson, and was amply sufficient to transfer to Crow and support a recovery by him of the entire commission. However, Crow, in his petition, alleged the transfer by Lee of a half interest in his claim for a commission, and is therefore limited in his recovery by this pleading to one-half of the commission.

The judgment is in all things affirmed.