## MARSHBURN et al. v. STEWART et al.
### (No. 1334.)

Court of Civil Appeals of Texas. Beaumont.
April 22, 1927.

Rehearing Denied May 25, 1927.

1. **Adverse possession ⚖️115(1)—In trespass to try title, defendants' title under three and ten year statutes of limitation held for jury.**

In trespass to try title, evidence *held* sufficient to take to jury issues whether those under whom defendants claim had title by virtue of three-year and ten-year statutes of limitation through possession by tenants.

2. **Adverse possession ⚖️42—Holders of apparent title to land held to have cause of action in trespass to try title against holders of true title, and limitation ran from accrual thereof.**

Holders of apparent title to land through heirs of deceased owner's wife *held* to have cause of action in trespass to try title against those holding true title under heirs of deceased owner, and limitation ran from accrual thereof rather than from time they could successfully maintain suit.

3. **Adverse possession ⚖️78—In construing three-year statute of limitation, title acquired by inheritance is as effectual as if by written memorial.**

Title acquired by inheritance is as regular and effectual as if by written memorial in determining regularity of title required under three-year statute of limitation.

4. **Adverse possession ⚖️70—"Title or color of title" in three-year statute means something less than paramount right.**

"Title or color of title," as used in three-year statute of limitation, means something less than paramount right to land.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Color of Title.]

5. **Adverse possession ⚖️10—Holders of true title may perfect it against holders of apparent title, claiming under heirs of deceased owner's wife, by adverse possession; "all claims" (Rev. St. 1925, art. 5513).**

Holders of true title to land under heirs of deceased owner may perfect such title as against holders of apparent title under heirs of deceased owner's wife by adverse possession, since they had "title or color of title" within Rev. St. 1925, art. 5513, and "all claims" includes such apparent claim.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, All.]

6. **Adverse possession ⚖️10—Holder of equitable title may obtain title under ten-year statute of limitation as against holder of legal title.**

Holder of equitable title to land, claiming under heirs of deceased owner, may obtain title under ten-year statute of limitation as against holders of naked legal title, claiming under heirs of deceased owner's wife.

7. **Vendor and purchaser ⚖️232(9)—Adverse possession of land held to be that of holders of real title rather than holders of apparent title, notwithstanding marriage between claimants.**

In trespass to try title between those holding apparent title and those holding real title, adverse possession of land *held* to be that of holders of real title through tenant, and notice to holders of apparent title and to world of adverse claim, notwithstanding marriage between claimants.

8. **Vendor and purchaser ⚖️239(6)—One cannot be innocent purchaser against title acquired by limitation.**

One cannot be innocent purchaser against title which has been acquired by limitation.

9. **Appeal and error ⚖️762—Appellants' reply brief, advancing additional propositions, will be considered, in absence of motion to strike.**

Reply by appellants to brief of appellees, in which they go extensively into statement of facts, and advance additional propositions to those presented in original brief, will be considered by Court of Civil Appeals, in absence of motion to strike it from record, notwithstanding appellees' criticism of it as violative of rules.

10. **Evidence ⚖️383(7)—In trespass to try title, partition cannot be established by descriptive calls in deeds without additional evidence.**

In trespass to try title, partition of land cannot be established by descriptive calls to certain line in deeds without additional evidence, since such recitations were at most nothing more than circumstances which neither court nor jury were compelled to accept.

11. **Husband and wife ⚖️196—Wife's power of attorney, affecting interest in land, in which husband did not join, held void.**

Power of attorney, affecting interest in land, executed by married woman while husband was living, in which husband did not join, *held* void.

12. **Acknowledgment ⚖️25—Wife's power of attorney, affecting interest in land, not separately acknowledged by her, held void.**

Power of attorney, affecting interest in land, by married woman, whose husband was living, *held* void, where she did not separately acknowledge it.

13. **Principal and agent ⚖️54—Attorney in fact to look after land, if duly authorized, held unauthorized to delegate powers.**

Attorney in fact of several married women, if duly authorized, *held* unauthorized to delegate powers to another so as to authorize latter to execute title passing deeds or partition land.

14. **Partition ⚖️8—For effective partition, title of others must pass to one to whom particular tract is set aside.**

For partition of land to become effective and binding, it is essential that title of others pass to one to whom particular tract is set aside.

⚖️For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**15. Tenancy in common ☞15(5)—Possession of one holding for two cotenants held adverse, inuring to benefit of one as to his share as against those holding under the other; "adverse possession."**

Possession of one holding for two cotenants *held* "adverse possession," inuring to benefit of one as to his share as against those holding under the other, since such other was recognizing and holding with his cotenant, and occupancy through tenant is as effective as personal possession.

- [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Adverse Possession.]

**16. Tenancy in common ☞13—Cotenant's possession inures to benefit of all cotenants.**

Possession of one cotenant inures to benefit of all his cotenants.

**17. Tenancy in common ☞15(1)—Hostile cotenant will acquire title by limitation, unless pretensions are restrained by judicial action, notwithstanding that he cannot be forced off land.**

Hostile cotenant cannot be forced off land, since he has right of possession, but he can and will acquire title by limitation, unless his pretensions are restrained by judicial action.

**18. Appeal and error ☞930(3)—It is conclusive on reviewing court that trial court rendering adverse judgment found bad faith by plaintiff, where submission of that issue was not requested (Rev. St. 1925, art. 2190).**

In trespass to try title, in which one plaintiff was found guilty of bad faith in purchases, it is conclusive on reviewing court that trial court, rendering judgment for defendants, found bad faith by another plaintiff furnishing money for such purchases, where submission of such issue was not requested, in view of Rev. St. 1925, art. 2190.

**19. Appeal and error ☞930(3)—Party not requesting submission of issues excluded is regarded in appellate court as having acquiesced in trial court's action.**

Where trial court expressly submits some issues and excludes others, and neither party makes written request for submission of those excluded, they must be regarded in appellate court as having acquiesced in such action and consented for trial judge to determine from evidence issue not submitted, since it is only by written request that party puts on record his dissent from court's action.

**20. Vendor and purchaser ☞245—In trespass to try title, question of constructive notice to plaintiff of defendants' rights held immaterial, where issue of actual notice was raised.**

In trespass to try title, question whether notice to one plaintiff of defendants' rights would be constructive notice to another who was furnishing money to buy land *held* immaterial, where issue of notice to such other was raised independent of first plaintiff's connection with case.

**21. Vendor and purchaser ☞244—In trespass to try title, verdict that plaintiff was guilty of bad faith in making purchases held not against weight of evidence.**

In trespass to try title, verdict that plaintiff was guilty of bad faith in making purchases with notice of defendants' rights *held* not against great weight and preponderance of evidence.

**22. Vendor and purchaser ☞245—In trespass to try title, defendant's adverse possession through tenant raised issue of notice of its rights to plaintiff making purchases.**

In trespass to try title, adverse possession of defendant through tenant *held* to raise issue of notice of defendant's rights to plaintiff making purchases.

**23. Vendor and purchaser ☞244—Plaintiffs held not to hold title under good-faith purchasers from heirs of holder of apparent title.**

In trespass to try title, plaintiffs *held* not to hold part of title under grantees of heirs of holder of apparent title who were good faith purchasers, in view of evidence.

**24. Vendor and purchaser ☞224—Purchaser of grantor's "right, title, and claim" to land is not "innocent purchaser."**

Conveyance of grantor's "right, title, and claim" to land will not constitute grantee "innocent purchaser."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Innocent Purchaser.]

**25. Vendor and purchaser ☞223—Grantee acquired no interest as innocent purchaser of apparent title, where conveyance carried more of real than of apparent title.**

In trespass to try title, plaintiff acquired no interest as innocent purchaser of apparent title under deed or power of attorney from one who was also heir of holder of real title, where such conveyance carried more of real title than of apparent title.

**26. Vendor and purchaser ☞224—Grantees of one purporting to "remise, release, and forever quitclaim" interest in land are not "innocent purchasers."**

Grantees of one who purported only to "remise, release, and forever quitclaim" interest in land are not innocent purchasers.

**27. Vendor and purchaser ☞224—One claiming under power of attorney, conveying undivided half interest in whatever might be recovered, is not "innocent purchaser."**

Power of attorney, conveying only an undivided one-half interest in whatever might be recovered, passed no title, being merely prospective interest in future recovery, so that grantee could not be innocent purchaser.

**28. Appeal and error ☞768—Appellees' uncontroverted statement that power of attorney relied on by appellants is not in record will be accepted.**

In trespass to try title, appellees' statement that power of attorney relied on by appellants is not in record will be accepted by reviewing court, where not controverted by appellants.

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**29. Vendor and purchaser ⊗⇒224—Contract under which party agreed to convey interest in land which "might be recovered" in litigation cannot support claim of innocent purchaser.**

Contract under which party agreed to convey at termination of litigation "one-fourth undivided right, title, or interest in whatever land might be recovered" cannot support claim of innocent purchaser.

**30. Vendor and purchaser ⊗⇒232(9)—There can be no "innocent purchaser" under power of attorney as against those holding by tenant title previously acquired by limitation.**

There can be no "innocent purchaser" under power of attorney as against those in possession by tenant and who acquired title by limitation prior thereto.

**31. Vendor and purchaser ⊗⇒224—There can be no "innocent purchaser" under conveyance of "such interest as we may be entitled to."**

There can be no innocent purchasers under language of power of attorney conveying "an undivided one-third interest in and to such interest as we may be entitled to."

**32. Appeal and error ⊗⇒768—Reviewing court need not go beyond appellees' statement as to nature of deeds under which appellants claim, where appellants made no statement from such deeds.**

In trespass to try title, reviewing court is not required to go beyond statement of appellees as to nature and recitations of deeds under which appellants claim to hold as innocent purchasers, where appellants made no statements from such deeds, but rested brief by giving character of instrument.

**33. Judgment ⊗⇒651—In trespass to try title, defendant held not estopped to deny bona fides of plaintiffs' purchases by agreed judgment in another case with plaintiffs' grantors.**

In trespass to try title, defendant held not estopped either by equitable estoppel or estoppel by contract to deny bona fides of plaintiffs' purchases, by agreed judgment in another case in which it agreed with plaintiffs' grantors as to extent of title, where agreed percentage was not acquired.

**34. Estoppel ⊗⇒87—Where real owner does not mislead purchaser as to title, and purchaser has equal knowledge, there can be no equitable estoppel.**

Where real owner does not mislead purchaser to his injury as to title, but it is made to appear that purchaser has same knowledge as real owner, there can be no equitable estoppel.

**35. Estoppel ⊗⇒78(1)—To form basis of estoppel, except in equity, entire contract must be invoked.**

To form basis of estoppel, except in equity, contract in all its terms must be invoked by one party against the other.

**36. Estoppel ⊗⇒78(1)—Parties assuming existence of fact in making contract are estopped to deny it so long as contract stands.**

If in making contract parties agree on or assume existence of particular fact as basis of negotiations, they are estopped to deny such fact so long as contract stands, in absence of fraud, accident, or mistake.

**37. Estoppel ⊗⇒78(3)—Claimant of title held not estopped by agreement that it owned certain per cent. of title; agreement being intended as matter of evidence.**

In trespass to try title, agreement of party before trial, together with all other parties to litigation that it owned certain per cent. of title, does not constitute estoppel, being clearly intended only as matter of evidence.

**38. Tenancy in common ⊗⇒19(2)—In trespass to try title, plaintiff held not entitled to defeat defendants' subsequently acquired title on theory of cotenancy under former contract and judgment between defendants and plaintiff's grantors.**

In trespass to try title, plaintiff held not entitled to defeat defendants' subsequently acquired title on theory that they were cotenants under former contract and judgment between defendants and plaintiff's grantors, where title claimed in common was nullity, since, where claimants assert hostile claims against each other, rule that one may share in result of the other's efforts to protect common title is inapplicable.

**39. Vendor and purchaser ⊗⇒243—In trespass to try title, letters between plaintiffs six months after purchases held inadmissible to show faith.**

In trespass to try title, exclusion of letters between plaintiffs, which were offered to show good faith in purchases, held proper, where they were written six months after last purchase.

**40. Appeal and error ⊗⇒757(3)—Appellants complaining of exclusion of testimony must show substance thereof.**

Appellants objecting to exclusion of certain testimony had duty to show by statement in brief substance of excluded testimony.

**41. Vendor and purchaser ⊗⇒243—In trespass to try title, letters of defendant's attorneys held admissible to show knowledge of true title at time of plaintiffs' purchase which would have been given to plaintiffs on inquiry.**

In trespass to try title, admission of letters of counsel of defendant held proper as showing that defendants could have advised plaintiffs if inquiry had been made as to status of true title when plaintiffs purchased land.

**42. Appeal and error ⊗⇒757(3)—Appellants complaining of admission of certain letters should set out substance thereof.**

Appellants complaining of the admission of certain letters of defendant's attorneys in trespass to try title should set out substance of letters complained of.

⊗⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**43. Vendor and purchaser ⊚═243—In trespass to try title, defendant's attorneys' testimony that plaintiff would have been advised of status of title, if inquiry had been made, held admissible.**

In trespass to try title, admission of oral testimony of defendant's attorneys that they would have advised plaintiff of status of title of property at time of plaintiff's purchase, if inquiry had been made, *held* proper.

**44. Vendor and purchaser ⊚═244—In trespass to try title, judgment held properly entered against plaintiffs for all land in controversy, in view of evidence, as against contention that defendants did not show quantity purchased in bad faith by plaintiffs.**

In trespass to try title, where evidence showed that plaintiffs held under apparent interest, and that neither plaintiffs nor their predecessors were innocent purchasers, judgment was properly entered against them for all land in controversy as against contention that defendants failed to establish what quantity of land in dispute was purchased by plaintiffs in bad faith.

**45. Appeal and error ⊚═742(6)—Appellants' proposition that court erred in submitting "issues 1, 2, 3, 4, 4a, 5, 6, 7, 8, and 9" held multifarious.**

Appellants' proposition that court committed error in submitting over their objections "issues 1, 2, 3, 4, 4a, 5, 6, 7, 8, and 9" *held* multifarious, and will not be considered.

**46. Appeal and error ⊚═742(1)—Specifications submitted as propositions without disclosing point complained of cannot be considered.**

Specifications of error, submitted as propositions without disclosing point complained of, cannot be considered.

### On Rehearing.

**47. Judges ⊚═47(1)—Judge of reviewing court held not disqualified because he represented defendant in previous suit against co-defendants.**

Judge of Court of Civil Appeals *held* not disqualified because ·he had represented defendant in previous suit in which adverse parties were codefendants in present suit.

**48. Judges ⊚═47(1)—Judge of reviewing court held justified in recusing himself on motives of propriety, where he had represented defendant in previous suit against codefendant.**

That judge of Court of Civil Appeals had represented defendant in previous suit against codefendant constituted sufficient warrant for his act in recusing himself ·on motives of propriety, though such facts do not constitute legal disqualification.

**49. Judgment ⊚═8—Judgment by two members of Court of Civil Appeals, with third member recused, is valid.**

Judgment rendered by two members of Court of Civil Appeals, where third member is recused, is valid judgment.

Appeal from District Court, Tyler County; J. M. Combs, Judge.

Suit by L. H. Marshburn and others against Sidney Stewart and others. Judgment for defendants, and plaintiffs appeal. Affirmed.

O. S. Parker and W. D. Gordon, both of Beaumont, Thos. B. Coe, of Kountze, and Jas. E. Wheat, of Woodville, for appellants.

Kennerly; Williams, Lee & Hill, of Houston, Orgain & Carroll, of Beaumont, and Coleman & Lowe and J. A. Mooney, all of Woodville, for appellees.

WALKER, J. This is a suit in trespass to try title, involving, as originally instituted, an undivided interest of 3,877 acres in the George T. W. Collins league in Tyler county, Tex. On a former appeal reversing and remanding in part a judgment in favor of these appellants for an undivided 78 per cent. of the land in controversy, their recovery was reduced to 1,816 acres, and the case remanded for a new trial as to the remaining 2,057 acres. See Stewart v. Marshburn, 240 S. W. 331, opinion by this court; Marshburn v. Stewart, 113 Tex. 507, 254 S. W. 942, by Commission of Appeals; 256 S. W. 575,·by Commission of Appeals; 113 Tex. 507, 260 S. W. 565, by Supreme Court..

On the former appeal only the issue of good faith of these appellants in purchasing the 78 per cent. claimed by them was involved. But upon the trial from which this appeal was prosecuted appellees defended, not only on the issue of want of good faith in appellants in acquiring their title, but also pleaded against them the issues of three and ten years' limitation. The jury found that appellants acquired their title in bad faith, and also found against them on the two issues of limitation.

The title to the 3,873 acres involved in this litigation is an undivided interest of the George T. W. Collins league in Tyler county, Tex., originally granted to Collins, transferred by him to Warren, and by Warren to Cyrus S. Aiken, by deed dated the 10th day of January, 1842, during his marriage with Mrs. Mildred S. Aiken. Neither Cyrus S. Aiken nor his wife had any children. He died January 10, 1843, leaving neither father nor mother surviving him, but left as his heirs his brothers, William A. Aiken, John G. Aiken, James L. G. Aiken, and his sister, Jane Love Aiken. James L. G. Aiken died in the early part of September, 1847, without issue, and his interest in the estate of his deceased brother, Cyrus S. Aiken, descended to, and vested in, his surviving brothers, William A. Aiken and John G. Aiken, and his sister, Jane Love Aiken. It was determined on the former appeal that the brothers and sister of Cyrus S. Aiken inherited under him the true legal and equitable title to all the property in controversy, but it was also de-

⊚═For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

termined that under the laws of Texas the apparent legal title to this property descended to Mildred S. Aiken upon the death of her husband, and finally, under heirship from her, this apparent title descended to, and became vested in, four of her collateral kindred in equal moieties. One of such heirs, a sister, was the wife of William A. Aiken, one of the brothers of Cyrus S. Aiken. It was agreed that appellants owned 78 per cent. of the apparent title under the heirs of Mildred S. Aiken, and the appellee Houston Oil Company owned 22 per cent. of that title. The agreement also set out the percentage of the true title under Cyrus S. Aiken, owned by the parties. It was under this agreement that appellants recovered 1,816 acres on the former trial under the true title acquired by them from the heirs of Cyrus S. Aiken. On the former appeal L. H. Marshburn was the plaintiff upon the trial of the case, and the appellee in the appeal from that judgment. Upon this trial the real plaintiffs, to wit, W. D. Gordon, O. S. Parker, and J. B. Hooks, made themselves parties plaintiff.

[1] Appellants duly excepted to the submission of the issues of three and ten years' limitation, and now assign errors against their submission and the jury's answers thereto as being without evidence to support them. These issues were submitted to and answered by the jury as follows:

"Did the brothers and sisters of Cyrus S. Aiken, their heirs, or those holding for them or any of them, have peaceable and adverse possession of the lands in controversy herein for three consecutive years at any time after March 30, 1870, and before the institution of this suit?

"You will answer this question 'Yes' or 'No' as you may find the facts to be."

The jury answered this question "Yes."

"Did the brothers and sisters of Cyrus S. Aiken, their heirs or those holding for them, or any of them, have peaceable and adverse possession of the land in controversy herein, cultivating, using, or enjoying the same for ten consecutive years before the institution of this suit?

"Answer said question 'Yes' or 'No.' "

The jury answered this question "Yes."

These issues must have their support in the following evidence:

John G. Aiken, a brother of Cyrus S. Aiken, deceased, on the 22d of April, 1844, appointed C. H. Taylor his agent and attorney to transact business matters in the Republic of Texas, and especially "to attend to all of my land claims in said Republic, * * * and to do every act * * * as he may deem necessary, proper, or expedient in assuring to me or my benefit good and sufficient legal titles to the lands aforesaid," making Taylor his general agent and attorney. Said C. H. Taylor, on January 29, 1861, wrote a letter to Captain James G. Collier, the material portions of which we quote:

"Round Top, Jan. 29th, 1861.

"Mr. James Collier—Dear Sir: I some time ago wrote to you proposing to employ you to find the G. T. W. Collins league of land. * * *

"I should therefore like to employ you as my agent for the land—I should like to put a renter on it—and if you will do so, put him not a great ways from the center, so that he will be sure to be on it.

"Let me know.

"Yours truly,          C. H. Taylor."

James G. Collier, on October 4, 1875, wrote a letter to said C. H. Taylor, the relevant portions of which we quote:

"Town Bluff Tyler Co., Texas, Oct. 4, 1875.

"C. H. Taylor, Esqr.—Dear Sir: I wrote you a few weeks since in relation to your (Collins) league of land in this county, but in consequence of the floods and storms I fear either mine or yours in answer may have been lost; I therefore write again. I put a tenant in possession as you requested and notified you at Round Top, and have continued to hold possession ever since. You wished a settler at or near the center of the league, but at first I could not get any person to settle near the center, as it was surrounded in time of high water. Five years ago, however, I got Wm. Ramer to settle for 5 years near the center and his time will be out this winter.

"As you already had one settler on the league I did not promise on your part any compensation except what he could make on the place during the five years, though he has been of some service in keeping off timber men, who know no land lines when cutting timber. * * *"

Dr. George W. Collier, a son of said James G. Collier, testified that in 1869 his father, as the agent of the owners, placed one William Ramer on the Collins league as the tenant of the owners; that Ramer had the entire league under his control, to supervise, use, and look after, to keep trespassers off, and to cultivate and enjoy the same. His testimony was positive and to the effect that Ramer lived on this land continuously from 1869 or 1870 to 1881, and sufficient to raise the issue that he continued living on the land continuously, holding it as a tenant for the owners until 1884. He said that Ramer frequently talked to him about his occupancy, saying that he held the land under James G. Collier, as tenant for the owners, and that he expected to receive a deed for a portion of the land in satisfaction of his contract of tenancy. Without quoting further from the evidence on the length of time Ramer lived on this league, it is sufficient to say that it raised the issue that he occupied it continuously for 13 or 14 years as a tenant for the owners, living near the north boundary line of the league. Dr. Collier also testified that his father placed one Allen Hooks on the league near the south boundary line in 1871 or 1872; that Hooks held the land as a tenant for the owners under his father from 1871 or 1872 until 1884. This witness testified that

his father made deeds to Hooks and to Ramer to parts of the Collins league. The deed to Ramer, dated September 21, 1881, and recorded November 25, 1882, contained the following recitals:

"State of Texas, County of Tyler.

"Know all men by these presents: That I James G. Collier, agent for C. H. Taylor of Green county and state of Alabama, and A. H. Hatch of Pensacola and state of Florida, and other persons represented by said Hatch, and whose names may be found in a power of attorney made and executed by said Hatch to said James G. Collier bearing date the 20th of January, 1876, and recorded in Book J, record of land deeds for Tyler county on pages 93 and 94, for and in consideration of an agreement made and entered into by said J. G. Collier as agent for said parties and owners at their instance and request with William Ramer, Jr., that said Ramer should enter upon and hold possession as agent and tenant for said Taylor, Hatch, and others of the G. T. W. Collins league situated and on the west bank of the Neches river in said state and county of Tyler. * * * I now in compliance with said agreement and instructions from said owners above referred to of the said G. T. W. Collins league of land grant alienate and convey unto the said William Ramer, Jr., his heirs and assigns fifty (50) acres of the said G. T. W. Collins league of land as follows to wit: [Here follows description of the 50 acres], with all and singular the rights, members and appurtenances thereto belonging or in any wise appertaining and I, the said J. G. Collier, agent and attorney in fact, as aforesaid, hereby agree that the said Taylor, Hatch and others named in said power of attorney shall warrant and defend the right and title of said bargained land and premises unto the said William Ramer, Jr., his heirs and assigns against themselves their heirs and assigns and all persons claiming under them.

"In witness whereof I hereunto set my hand as agent as aforesaid on this the 21st day of September, 1881. James G. Collier, Agent for

"C. H. Taylor. [Seal.]

"A. H. Hatch and Others. [Seal.]"

The deed to Hooks was for 160 acres, dated November 9, 1881, and contained the same general recitations as the deed to Ramer. We give the following quotation from that deed:

"State of Texas, County of Tyler.

"Know all men by these presents: That I, James G. Collier, agent for C. H. Taylor of Green county and state of Alabama, A. H. Hatch of Pensacola, Fla., but formerly of Hale county, Ala., and other persons represented by said Hatch and whose names may be found in a power of attorney made and executed by said Hatch to said J. G. Collier, bearing date January 20, 1876, and recorded in Book J, records of land deeds from Tyler county on pages 93 and 94, for and in consideration of an agreement made by said J. G. Collier as agent for said owners at their instance and request with J. D. Phelps in the year 1861, that the said Phelps should enter upon and hold possession of the G. T. W. Collins league of land situate

and lying on the west bank of the Neches river in said county of Tyler. * * *"

Allen Hooks testified that he was familiar with the Collins league; that his uncle, Allen Hooks, moved on to that league about December, 1871, and lived there until 1883 or 1884. John Swearigen testified that Allen Hooks moved off the league in 1883 or 1884 or 1885. While the tenancy of Hooks is not as clearly established as that of Ramer, unquestionably the evidence is sufficient to raise the issue that he occupied the league under Mr. Collier, as a tenant of the owners, for as long as ten years, and for his services received the deed to 160 acres of land. We conclude that the evidence was sufficient to raise the issue that William Ramer, living on the north side of the league, and Allen Hooks, living on the south side of the league, each holding under Mr. Collier, were tenants on the land for more than ten consecutive years from and after 1870—in fact, from those dates until 1884, holding the same as tenants for the owners. As sustaining our conclusion that the issue was raised that Ramer and Hooks were holding the land as tenants for the true owners, that is, for the heirs of Cyrus S. Aiken, we take the following statement from appellees' brief:

"The authority of Collier to act for the owners is shown by the testimony of Dr. Geo. W. Collier, by the letter from C. H. Taylor to Capt. Collier, by the letter from Capt. Collier to C. H. Taylor, and the appointment of C. H. Taylor as the agent of John G. Aiken—all shown by the statement above.

"Capt. Collier, in addition to being the agent of John G. Aiken, through C. H. Taylor, was also the agent of other heirs of Cyrus S. Aiken, as is shown by the following: Wm. A. Aiken, a brother of Cyrus S. Aiken, had a daughter who was Mrs. Jane C. Beck. On November 22, 1875, she empowered A. H. Hatch to act for her in transacting business with C. H. Taylor with reference to vouchers, land certificates, lands, etc., placed in his possession by John G. Aiken as agent and attorney, in fact 'for all said Aikens or C. S. Aikens, or W. A. Aikens interest' in Texas lands, notes, and other property, etc. Wm. A. Aiken was dead when this instrument was executed. It was recorded January 22, 1876.

"Another daughter of Wm. A. Aiken, Mildred S. Hatch, on December 1, 1875, made a power of attorney in the same language to said A. H. Hatch. It was recorded January 22, 1876.

"Another daughter of Wm. A. Aiken, Mary N. Hatch, and her husband C. I. Hatch, and a son of a deceased daughter of Wm. A. Aiken, by his father as guardian, executed a like power of attorney to A. H. Hatch on December 1, 1875. It was recorded January 22, 1876.

"That all of these parties were heirs of Wm. A. Aiken, the brother of Cyrus S. Aiken, is shown by the testimony of Mrs. Harroun, a daughter of Mildred S. Hatch and granddaughter of Wm. A. Aiken.

"After the execution of the powers of attorney, said A. H. Hatch, on January 20, 1876, appointed James G. Collier to represent him

and his principals with reference to said Collins league of land, and to lease, rent, or sell such portions as he might see fit, etc. This instrument was recorded on January 29, 1876, in Book J, p. 93 et seq., of the deed records of Tyler county.

"The deeds from said Collier to William Ramer and Allen Hooks recited the agency of Collier in this language: 'Know all men by these presents that I, James G. Collier, agent for C. H. Taylor * * * and A. H. Hatch * * * and other persons represented by said Hatch, and whose names may be found in a power of attorney made and executed by said Hatch to said James G. Collier, * * * recorded in Book J, record of land deeds for Tyler county on pages 93 and 94.' Collier signed the deeds 'James G. Collier, Agent for C. H. Taylor, A. H. Hatch, and others.'

"The deed from Capt. Collier to Allen Hooks was witnessed by G. W. Collier. G. W. Collier testified that James G. Collier 'was acting there in looking after that land for Hatch, Aikens, Gaines, and Taylor.'

"As before shown, Hatch was the agent of the heirs of Wm. A. Aiken. Taylor was the agent of John G. Aiken. Gaines was a tenant in common with Cyrus S. Aiken, both having purchased from David O. Warren as shown by the agreement on page 14 of the statement of facts."

The fourth paragraph of the agreement referred to in the closing sentence of the statement from appellees' brief reads as follows:

"Fourth. It is also agreed that title to the entire G. T. W. Collins league in controversy here passed to David O. Warren, and out of him by two deeds, one to Cyrus S. Aiken, dated January 10, 1842, and one of about the same date from David O. Warren to W. P. B. Gaines," etc.

From the statement as made, we conclude that the issue was raised for the jury that Mr. Collier and tenants under him were holding the land for the heirs of Cyrus S. Aiken, that is, for his brothers William A. and John G., and his sister, Jane Love, and their heirs. We do not give a further review of the facts on the issue just discussed, because it is appellants' proposition that the evidence was insufficient as a matter of law to raise the issues of limitation, and not that the verdict of the jury answering the questions submitted to them on these issues was against the great weight and preponderance of the evidence.

Now, attacking the judgment of the trial court in favor of appellees, in so far as it must have support on the limitation issues, appellants advance the following propositions:

"(1) Under the proof and the law as applied thereto by the court, Cyrus S. Aiken's collateral heirs held the real, full, fee-simple title to the land in controversy at the time the possession relied upon began and ended.

"If such possession was theirs under a claim of title, it could add nothing to such title.

They could not acquire title by limitation, because they already had the entire title.

"The owner by possession may give notice of his title, but he can add nothing thereto, his title remaining as it was in the beginning. The possession by the owner is not adverse possession within the meaning of limitation statutes, and such statutes of limitation have no application to possession by the true owner."

We quote as follows from their argument in support of this proposition:

"Since the true owner has, by virtue of his title, the constructive possession, when he takes possession of unoccupied lands belonging to him, there is no one to oust and therefore no ouster possible.

"Again, it is fundamental that limitation as applied to lands can operate only to bar a superior right or confer a title which presupposes necessarily that there was a title outstanding not in the possessor to be conferred by virtue of the statute of limitation.

"As said in Carlock v. Willard (Tex. Civ. App.) 149 S. W. 365:

"'It is said that the effect of the statute is to make the period of prescription mature the inferior title of the possessor into the superior title.'

"The cases in Texas, as well as elsewhere, denying the defense of innocent purchaser against a limitation title all relate to such defense set up as against a title acquired by limitation and none to a defense against the superior title under which possession was held. They could have no application to such a title, because it has no element of or origin from a title, the source of which cannot be the subject of registration.

"The leading case in Texas announcing the doctrine relied upon by our opponents is MacGregor v. Thompson, 7 Tex. Civ. App. 32, 26 S. W. 649, opinion by Justice Williams, wherein he holds that one is not protected as an innocent purchaser against 'What?' 'Against the title acquired by limitation of which he was ignorant when he purchased.'

"The latest case we have in mind following and citing the case last above mentioned is Bryan v. Ross (Tex. Civ. App.) 214 S. W. 528, wherein it is said:

"'If Deck Martin had title to his interest in the land by limitation, it is obvious * * * in such event this title could not be defeated by the plea of innocent purchaser.'

"Since it is contended by appellants, and the honorable trial court has so held and submitted this case to the jury on such holding, to wit, that the separate estate of Cyrus S. Aiken owned this land and the true title thereto passed to his heirs, manifestly their title was acquired prior to, and independent of, any possession, and, being so acquired, was not the subject of limitation in their favor arising from their own possession.

"From this it is manifest that such possession as may have been shown by the evidence in this case, and as found by the jury, can have no operation and no bearing upon the case at bar otherwise than as it may or may not be sufficient as a matter of notice."

"Under the evidence, given the most favorable effect to appellee which the record taken

as a whole will justify, there was never a cause of action accruing to those claiming, under the surviving wife of Cyrus S. Aiken, the apparent title to this land, by which they could have ousted the possession taken or held by any one as a tenant placed there by Capt. James G. Collier for those whom he represented."

[2] We cannot agree with appellants in their proposition. As holders of the apparent title, appellants and their privies had a cause of action against appellees and their privies holding the true title. This was directly held by the Commission of Appeals in its opinion reversing the judgment of this court (113 Tex. 507, 254 S. W. 942, and, when we refer herein to the opinion of the Commission of Appeals, we are to be understood as having reference to this decision). It was said:

"We think the burden of proof in this case is controlled by the provisions of our statute which made the land involved herein apparently the common property of Aiken and his wife. In a contest between them in their lifetime he would have had to establish any claim to the contrary by proof. After his death, before the heirs of his separate estate could have recovered such land from her they would have had the burden of establishing their claim thereto in like manner,"

—thus affirmatively holding that the heirs of Mrs. Aiken did have a cause of action against the heirs of Cyrus S. Aiken—holding that Mrs. Aiken, in the lifetime of her husband, had a title sufficient to force him to assert his defenses, that is, that she had prima facie a good cause of action for the land, which was inherited by her heirs. In 25 Cyc. 1065, it is said:

"The accrual of the cause of action means the right to institute and maintain a suit; and, whenever one person may sue another, a cause of action has accrued and the statute begins to run."

Clearly, the Commission of Appeals held that Mrs. Aiken could "sue" her husband for this land, and that her heirs could sue his heirs. This proposition was quoted with approval by the Commission of Appeals in Deaton v. Rush, 113 Tex. 176, 252 S. W. 1025. Appellants construe this decision as "holding that limitation as to land does not run against one until he can successfully maintain a suit against the party in possession to oust him." We do not give it that construction. The Commission of Appeals, in the course of its opinion, not only quotes the proposition from Cyc. just given, but also quotes the following proposition from Port Arthur Rice Milling Co. v. Beaumont Rice Mills, 105 Tex. 514, 143 S. W. 926, by the Supreme Court:

"Before it can be said that a cause of action exists in a legal sense, there must be, such a mature right as may be declared upon and maintained" (not successfully maintained, as appellants insist) "subject only to such valid defenses by which it may be defeated."

[3] The apparent title to the land certainly gave Mrs. Aiken and her heirs a "cause of action" as that term is used in the case just cited. The true title to all the land in controversy, as was determined upon the former appeal, vested in Cyrus S. Aiken, "by regular chain of transfer from or under the sovereignty of the soil," as required by the three-year statute of limitation. This title in all its regularity descended to his collateral kin, that is, his brothers and sister and their heirs at law, as effectively as if by written memorial. Discussing the three-year statute and regularity of the title required, our Supreme Court said, in Whitehead v. Foley, 28 Tex. 3:

"Title acquired by inheritance is as regular and effectual as if by written memorial."

See, also, Williamson v. Simpson, 16 Tex. 435, and Kennon v. Miller (Tex. Civ. App.) 143 S. W. 986.

[4, 5] Of course, "title or color of title," as used in the three-year statute, means something less than "the paramount right to the land." Burnham v. Hardy Oil Company, 108 Tex. 564, 195 S. W. 1139. This proposition is inherent in the very nature of the statute, for, if the holder of the "title or color of title" had the paramount right to the land, he would have no occasion to invoke the statute. In the case before us, under the decision of the Commission of Appeals upon the former appeal, the collateral heirs of Cyrus S. Aiken were in great danger of losing their title, and we are faced in this case with the proposition that in fact they have lost it. They did not have the "paramount right," or their adversaries would not now be claiming their lands. True, they hold by a regular chain of transfer. True, they were, in fact, the legal and equitable owners of the land. But there was a "legal title" between them and their enjoyment of the estate. They could have the "paramount right" only by destroying this apparent title. They could do that by purchase—this title had a value on the market, since, as we know from this record, appellants invested in it more than $14,000, or they could have removed it by judicial proceedings—clearly they could have brought the heirs of Mildred S. Aiken into court and relieved their title of this danger, or they could have perfected their title by limitation, which, in fact, they did. In Burnham v. Hardy Oil Co., supra, Judge Phillips said that a limitation claimant under the three-year statute "derives no aid from equity, nor is he dependent upon any of its doctrines. The statute, alone, is the measure of his right, and meeting its requirements alone entitles him to its protection. 'Title,' as used in this statute, does not mean the title which equity may in a proper case bestow. It re-

fers to a title held by legal right as evidenced by a regular chain of transfer from the sovereignty of the soil. For illustration, the claimant's rights are not prejudiced by actual knowledge of the existence of the superior right. By the same rule, they are not bettered by his want of knowledge of its existence. No equitable considerations can make them superior to what they would be without the presence of such considerations. His title is simply such as the chain of transfer, tested by itself, unaided by any equity and unimpaired by any equity, confers. It is not defeated by the rights of others which lie outside of it. Neither is it supported by any rights in favor of the claimant which lie equally without it. Its strength, as well as its weakness, is only that of the chain of transfer which constitutes it."

Appellees' title rests perfectly within the literal language of Judge Phillips' proposition. When the collateral heirs of Cyrus S. Aiken placed tenants on this land to hold and occupy it for them, they were holding under a chain of transfers that tested by itself, unaided by any equity, and unimpaired by any equity conferred upon them "the right originally acquired in virtue of the grant." They had by inheritance every right to the land that passed from the Republic of Texas to Collins and from him to Warren and from Warren to Aiken. "Title or color of title" flowed to them from the sovereignty by a regular chain of transfers from or under the sovereignty of the soil. Their title was "simply such as the chain of transfer, tested by itself, unaided by any equity and unimpaired by any equity, conferred." Their chain of title and their rights under the three-year statute were not being attacked "by the rights of others which lay outside of it," but their adversaries are claiming only the shadow, of a title under the same chain of transfers. Through their tenants they were holding under "title or color of title," as that term is used in the three-year statute, and their possession brought them within the provisions of article 5513, Revised Statutes 1925, declaring that "the person having such peaceable and adverse possession shall be held to have full title, precluding all claims," and "all claims" must certainly include an apparent claim which is of the dignity of a "legal title" and of such importance as to be the cause of all the litigation affecting the history of this title.

But appellees also raised the issue of 10-year limitation, and had the verdict of a jury thereon. Appellants also insist that they cannot avail themselves of this defense, basing their contention on the proposition and argument already quoted. They say that the heirs of Cyrus S. Aiken "could not acquire title by limitation because they already had the entire title." Can it be that a naked trespasser could divest the apparent and true owners of their title, and yet the true owners could not extinguish the apparent title? Can it be that the real owners had no remedy against the apparent title except by purchase or by costly judicial proceedings? It must be the law of this state that the real owner, by taking possession, gives notice to the apparent owner that he must assert his title, whatever it is, or within the statutory periods of limitation it will be barred.

[6] These issues of limitation have support in another proposition. The Commission of Appeals said that the apparent title was the legal title, and that the true title owned by these appellees had at least the dignity of an outstanding equitable title. If appellees' rights cannot extend beyond that limitation, on the theory that they are in the attitude of the holders of an equitable title, they have by this ten years' possession divested the heirs of Mildred S. Aiken of their legal title, and have acquired a title under the ten-year statute of limitation superior to all other claims to the land. Discussing the effect of ten years' possession by a holder of an equitable title against the naked legal title, our Supreme Court said, in Heirs of Burton v. Carroll, 96 Tex. 326, 72 S. W. 583:

"We conclude that the effect of limitation was to divest the naked legal title, which the plaintiffs in error had under the patent, out of them and to vest it in the defendants in error, who held the equitable title, and the plaintiffs in error occupy just the same position as if they had parted with their legal title by conveyance to the owners of the equitable title."

[7] (2) Appellants' second proposition attacking the issues of limitation is as follows:

"The possession shown in this case, accepting the verdict of the jury thereon for the purpose of this argument as correct, was insufficient to give notice of any claim antagonistic to the apparent title held by the heirs of Mildred Aiken, because the persons under whom such possession was held were her heirs, although some of them were heirs of Cyrus Aiken as well. Yet they apparently held as heirs of Cyrus Aiken through Mildred Aiken, since the law as applied to the deed on record made the property conveyed to Cyrus Aiken the community property, which upon his death became invested in its entirety through the Texas law of descent and distribution in Mildred Aiken, and upon her death in her heirs.

"Their title was, therefore, apparently that coming through Mildred Aiken, and the possession was apparently the possession based on heirship from Mildred Aiken, although, under the charge of the court, their real title, or true title, not apparent by anything of record in Texas came to them as heirs of Cyrus Aiken otherwise than through Mildred Aiken. But their possession was not notice of such a claim, because ambiguous and calculated to mislead."

This proposition has its basis in the fact that William Aiken's wife was a sister of Mildred Aiken, and that his children inherit-

ed their moiety of the true title through him and of the apparent title through their mother. It appears from our statement, supra, that one of his daughters, Mrs. Beck, empowered Hatch to act for her; that two other daughters of William Aiken also executed powers of attorney to Hatch. Under their proposition, appellants are saying that the holding of the tenants was under the apparent title. By looking to the letters in evidence, which we give supra, and the oral testimony of the witnesses as quoted, it is clear as an issue of fact that the tenancy was for the benefit of the heirs of Cyrus Aiken. Had inquiry been made of Ramer and Hooks during their tenancy, the source of their right to be on the land would have been disclosed. We believe their possession, as a fact issue was notice to the world of the claim being asserted at that time by the collateral kindred of Cyrus Aiken, and was sufficient to advise the heirs of Mildred Aiken and those who might have desired to purchase from them that an enemy's flag was flying over their land. Moore v. Chamberlain, 109 Tex. 64, 195 S. W. 1135; Houston Oil Co. v. Choate (Tex. Com. App.) 232 S. W. 285.

But, if we are in error in saying that the possession of Ramer and Hooks, as a matter of law, was sufficient to give an innocent party notice of the claims being asserted by the heirs of Cyrus Aiken, had he examined an abstract of the title to this land, he would have been advised of the following facts:

In his deed to Allen Hooks, of date 9th day of November, 1881, Collier recited that he put J. D. Phelps on this land in 1861, at the instance of the owners (C. H. Taylor, A. H. Hatch, June C. Beck, Mildred S. Hatch, and Mary N. Hatch, children of William A. Aiken). In 1861 the evidence discloses that William A. Aiken was dead, but his wife, the mother of these "owners," was not dead, and did not die until the 16th of April, 1862. Therefore, when the daughters put Phelps in possession, they must have been claiming under their father, for the mother was living, and under her the daughters had no interest in the apparent title. In their powers of attorney these "owners" authorized Hatch to transact business with C. H. Taylor to recover lands, papers, etc., from him in his possession as agent of John G. Aiken, C. S. Aiken, and William A. Aiken. The deed from Collier to Ramer recited that he was acting as the agent of the children of William A. Aiken. Therefore, if it does not appear as a matter of law that the possession of Ramer and Hooks was notice to the world of the title of those under whom they hold, it was clearly an issue of fact resolved by the jury and the court's judgment against appellants' proposition.

[8] (3) Appellants' third proposition attacking the issue of limitation was as follows:

"Prior possession, when abandoned, ceases to be notice as to one purchasing the apparent title, and prior possession under the real title is not notice after it is abandoned to one purchasing the apparent true title. Under such possession one already holding the true title does and can acquire nothing; he having previously acquired the entire title in fee, there is nothing more to be acquired. Therefore it is no bar to innocent purchase of the apparent title that the holder of the real title may have previously held possession thereunder for any period of time, no matter how long continued it may have been."

It is the law of this state that one cannot be an innocent purchaser against a title acquired by limitation. Burton v. Carroll, supra; East Texas Land Co. v. Shelby, 17 Tex. Civ. App. 685, 41 S. W. 543; Bryan v. Ross (Tex. Civ. App.) 214 S. W. 527; Bowles v. Bryan (Tex. Com. App.) 247 S. W. 279. Now, since under our holding the prior possession of appellees and those under whom they hold had ripened into "title," this proposition is not in point on the facts of this case, and presents only an abstract issue, and is overruled without further discussion.

[9] What we have said disposes of all of appellants' propositions on the facts brought forward in their original brief, which was filed in this court in November, 1926. On the 23d of February, 1927, appellants filed what they call a "Reply by appellants to brief of appellees," in which they go extensively into the statement of facts, and advance additional propositions to those presented in their original brief. Appellees criticize this reply brief as being violative of the rules, but do not make a motion to strike it from the record. Therefore we are treating it as being properly before us and as requiring our consideration. The principal burden of this reply brief is to analyze the facts and show as a matter of law that "the uncontroverted evidence which shows the possession, even if held as claimed by them (appellees), would be insufficient to mature such limitation." What we have said disposes of most of their contention, since we have concluded that the issue was raised for the jury that Ramer and Hooks were on the land for more than ten years as tenants of the true owners.

But appellants say in this reply brief:

"It affirmatively appears that the land was partitioned—how we do not know—that C. H. Taylor claimed 1,221 acres, and tax receipts were issued to C. H. Taylor direct for taxes on 1,221 acres of the G. T. W. Collins League for the years 1882, 1885, 1886, 1889, 1890, 1891, and 1892, and similar tax receipts were issued to 'J. G. Collier, agent for C. H. Taylor,' showing payment of taxes on 1,221 acres in the G. T. W. Collins league for the years 1881, 1883, 1886, 1887, 1890."

[10] In support of this proposition, appellants referred to a map showing a division line across the league running east and west

1,550 varas north of the south boundary line, cutting off on the north side the Ramer possession with 1,776 acres. Also they quote from deeds made by Collier, as agent of the owners, dated 12th of November, 1879, to other parties, in which he called for this division line; Also a deed from Robert Webb, as agent and attorney in fact for "all the heirs of Jane Love Aiken and John G. Aiken, brother and sister of Cyrus S. Aiken," in which he recognized the division line. On these facts, appellants advance the proposition that Ramer's possession could not extend south of the division line, and, since the burden rested on appellees to show that his possession matured a limitation title before the partition, which burden they did not meet, they cannot now prescribe under his possession. In answer to this proposition, it is sufficient to say that there is no evidence in the record of any partition among Gaines, Taylor and the other claimants, except descriptive calls in said deeds made by Collier. These recitations at the most were nothing more than circumstances which neither the court nor the jury were compelled to accept. Brewer v. Cochran, 45 Tex. Civ. App. 179, 99 S. W. 1033.

[11-14] In the next place, the powers of attorney under which Hatch and Collier purported to act were insufficient for them to convey or partition the land, but were as potent as would have been verbal authority to authorize the acts of Collier in putting tenants on the land. The powers of attorney referred to were by Jane C. Beck, Mildred S. Hatch, and Mary N. Hatch, daughters of William A. Aiken, made while their husbands were living. Mrs. Beck's husband did not join in the power of attorney, so it was void. The husband of Mildred S. Hatch was living, and was named by her as her attorney in fact, so it was void. Mary N. Hatch's husband also was living, and, as she did not separately acknowledge her power of attorney, it was void. While A. H. Hatch could not convey the land or divest either of the married women of their title, as we have seen he did get Mr. Collier to look after the land, place tenants thereon, etc. But, had Hatch been the duly authorized attorney in fact of the several married women, he could not have delegated his powers to Mr. Collier, so as to authorize him to execute any title passing deeds. Each and every act that Mr. Collier performed under the instruments was as their agent to look after the land, but his agency was limited, for he was without power or authority to convey the land or any part thereof, and any attempt that he or any other person, except the owners, might have made to partition the land could not have had that effect. Of course, it is a sound legal proposition to say that, for a partition of land to become effective and binding, it is essential that the title of others passed to the one to whom a particular tract is set aside. One

without title cannot divide lands except under delegated authority, and, since Mr. Collier was not the owner, and had no such authority, his act in partitioning the land, if in fact he did do so, was void. The most that can be said in support of appellants' proposition is that an issue was raised of such partition, which was resolved by a jury and the court against them.

But, had there been a partition in fact, dividing the 1,776 acres on the north from the remaining portion of the league on the south, still appellees have a title by limitation to the southern division of the league under the possession of Allen Hooks.

[15] Appellants' final proposition on the issue of limitation with the facts upon which it is based is thus stated by them:

"It will be borne in mind that the deed from David O. Warren to Cyrus S. Aiken, through which all parties to this suit trace their chain of title to all lands now involved in this suit, conveyed only a part of the Collins league, to wit, 3,873 acres. The balance of the league, which, if it contained 4,428 acres, amounted to just 555 acres, passed to Gaines, and Gaines' title passed down to these appellants; and through him these appellants recovered all of said league not included in the deed from Warren to Aiken, which recovery was made final on former appeal of this case. Gaines, therefore, was a tenant in common with all claiming under the deed from David O. Warren to Cyrus S. Aiken, owning an undivided portion of the land, owning all except that portion which passed by said deed from David O. Warren to Cyrus S. Aiken, or all of the league, except an undivided 3,873 acres. The evidence showing that Ramer went in possession under direction of James G. Collier, who represented Gaines, as well as Hatch, Aiken, and Taylor, and that he held as a tenant for Gaines as well as the others, Gaines' interest being undivided, the point is that Ramer held as a tenant of Gaines, regardless of who owned the undivided 3,873 acres or any portion thereof. Therefore no one had a valid right to oust his possession as tenant of Gaines, and, there being no cause of action in any one claiming under the deed from David O. Warren to Cyrus S. Aiken, by virtue of which they could oust the possession of Ramer, held as a tenant of Gaines, his possession could not start limitation to running against any claim made to the undivided interest in said league now owned by Gaines."

We would answer this proposition thus:

(1) While there was evidence—much of it —to the effect that Ramer was the tenant, not only of the collateral kindred of Cyrus S. Aiken, but also of their cotenant, Gaines, the issue was raised that he was on the land as the tenant of the Aikens, holding for them and under them. In view of this evidence and of the admitted cotenancy, the facts were subject to the construction that Ramer was holding for the Aikens, but also in recognition of the rights of their cotenant, Gaines. This construction of the evidence is fully sus-

tained by the letter from Taylor and the evidence of Dr. Collier, explaining the tenancy of Ramer and Hooks, and by the deed from Mr. Collier to Ramer in satisfaction of his tenancy contract.

(2) But, if the evidence were subject only to appellants' construction, yet Gaines was admittedly the cotenant of the Aikens. Ramer was admittedly—under appellants' proposition—holding for the Aikens as well as for Gaines, and, as notice by occupancy through a tenant is as effective as personal possession, the possession of Ramer, holding jointly for all the tenants, was "adverse possession," as that term is used in the limitation statutes. We say this because, had an inquiry been made of Ramer by an interested party, his right to be on the land would have been disclosed.

[16, 17] (3) It is the law of this state that the possession of one cotenant inures to the benefit of all his cotenants. Foster v. Johnson, 89 Tex. 645, 36 S. W. 67; Davidson v. Green, 27 Tex. Civ. App. 394, 65 S. W. 1111; Ramirez v. Smith, 94 Tex. 190, 59 S. W. 258. Therefore, granting that Ramer was holding under Gaines, and that the heirs of Mrs. Aiken could not have ousted his possession, yet his holding inured to the benefit of the true owners. The possession was open, hostile, and continuous, under the lawful owners, asserting in the most positive way their claim of right. While there was an apparent cotenancy with the heirs of Mildred Aiken, it was made to appear affirmatively that the holding was not for their benefit. The heirs of Mrs. Aiken, at the most, were in the attitude of cotenants out of possession, but facing a hostile cotenant who was claiming adversely, and by his acts giving notice of his hostile claim. A hostile cotenant cannot be forced off the land—he has a right of possession—but he could and would acquire a title by limitation, unless his pretensions were restrained by judicial action. So, while there was an apparent cotenancy with Gaines, he was recognizing and holding with the heirs of Cyrus S. Aiken as a cotenant. His act of possession, through Ramer, jointly with the Aikens, was open and hostile to appellants' title. Of course, this brings us back in its ultimate effect to appellants' first proposition that on the facts of this case a limitation title could not be perfected against the apparent title. If we have correctly overruled that proposition, our argument is as effective barring the apparent title under the proposition now being discussed as under appellants' first proposition.

We might properly affirm the judgment of the trial court on the issues of limitation, but, because of the importance of the questions involved, as well as of the subject-matter of the suit, we believe our duty requires us to dispose of all issues raised by appellants, in order that they may be able to present their entire case fully to the Supreme Court in the petition for a writ of error, especially so since, as we understand the law involved, no reversible error has been assigned.

We give the following introductory statement on the issues of good faith. On the 12th day of May, 1917, Marshburn and Gordon entered into a contract to purchase the Aiken interest in the land in controversy on the conditions that Gordon was to furnish all the necessary funds, Marshburn was to do the buying, taking the title in his name, and, upon the sale of the lands so acquired, Gordon was to be reimbursed for all money expended by him, and the balance was to be divided equally between them. Prior to the date of this contract, Marshburn had acquired certain interests in the title. In the charge to the jury the court listed seven deeds to Marshburn, the first dated the 20th of April, 1918, and the last the 12th of September, 1918, and under questions 1 and 2 asked the jury if Marshburn, at the time of making these purchases, knew that the land was the separate property of Cyrus S. Aiken, which they answered in the affirmative. These questions were followed by others submitting the issue of Gordon's good faith under these purchases, which the jury were told not to answer if they found that Marshburn was a bad-faith purchaser. This instruction withdrawing the issues as to Gordon was not excepted to, nor did appellants request the court to submit the issues as to Gordon nor as to Marshburn in relation to the purchases made by him prior to April 20, 1918, nor as to any of the grantees under the Mildred Aiken title who had conveyed to Marshburn.

On this proposition, appellants advance the following: (a) That the evidence was insufficient to raise the issue that Marshburn or Gordon purchased in bad faith; (b) that, even if Marshburn was a bad-faith purchaser, yet he was only the agent of Gordon, who was not visited with notice of his fraudulent acts; (c) that the verdict of the jury against Marshburn's good faith was against the great weight and preponderance of the evidence; (d) that, regardless of the good faith of either Gordon or Mashburn, they held a part of their title under certain grantees of the heirs of Mildred Aiken, who were good-faith purchasers, and therefore through them they acquired a good title.

None of these propositions are sound. The facts upon this appeal, in so far as notice to Marshburn of the true title at the time he purchased the apparent title, are the same as on the former appeal, and we here refer to the opinion of the Commission of Appeals, where those facts are set out and analyzed. After a careful review of the facts on this issue, the Commission of Appeals state their legal effect on the issue of notice to Marshburn in the following language (254 S. W., 942):

(295 S.W.)

"The evidence in this case raises an issue of fact as to whether Marshburn, knowing a claim to the land had been asserted by said heirs, exercised due diligence in pursuing his inquiry concerning the basis of such claim, which issue on another trial should be determined by the court under all the facts and circumstances in evidence at such trial, or submitted to a jury under proper instructions."

[18] The record on this appeal shows that appellant Gordon had access to an abstract giving him direct notice of all the facts within the knowledge of Marshburn. Of course, the legal effect of such information was the same to Gordon as to Marshburn. It thus appears, under the opinion of the Commission of Appeals, that the issue of notice was raised against both Marshburn and Gordon. While the court in his charge on this issue limited this notice to certain deeds named in the charge, and to notice to Marshburn, yet, if appellants wanted a fuller charge, it was their duty to request it. And, if they wanted a jury's verdict as to the bona fides of Gordon, it was their duty to request it. Since this issue was raised by the evidence against Gordon and against all purchases made by Marshburn, and since the trial court rendered a judgment against appellants, it is conclusive on us that the trial court resolved these issues against the good faith both of Marshburn and of Gordon. Article 2190, Revised Statutes 1925:

"Upon appeal or writ of error, an issue not submitted and not requested is deemed as found by the court in such manner as to support the judgment if there is evidence to sustain such finding."

[19] The construction given this article by the Supreme Court in Moore v. Pierson, 100 Tex. 113, 94 S. W. 1132, fully sustains our proposition. In the charge immediately following the issues of good faith as to Marshburn, already stated, the trial court submitted certain issues as to Gordon, but on the conditions of questions 1 and 2 withdrew those issues from the jury. This was without objection from appellants, and the charge stood as if those issues were not before the jury. As an issue of fact, Gordon's good faith could go to the jury only by the independent act of the court or on the request of the parties. As these issues were not submitted, the consequences must necessarily be "that when the trial court has expressly submitted some issues and excluded others and neither party has put in writing a request for the submission of those excluded, they must be regarded in the appellate court as having acquiesced in such action and consented for the trial judge to determine from the evidence the issue not submitted. It is only by a written request that the party puts on record his dissent from the action of the court and his insistence upon the right to

have the jury, rather than the judge, decide the point at issue." Moore v. Pierson, supra.

[20] But appellants insist that the law protecting a bona fide purchaser intends that he who parts with value in good faith shall be protected in his purchase, and that it is immaterial what may be the conduit or channel through which his purchase was effected. Under this proposition, the undisputed facts show that every dollar of the purchase money under the Gordon-Marshburn contract was paid by Gordon. Therefore, they say that a finding that Marshburn, who paid no part of the purchase money, and who was a mere instrumentality or conduit through which the purchase was made, knew that the land was the separate property of Cyrus S. Aiken, was immaterial as affecting the issues of this case. Under these facts, appellants advance the following proposition:

"If Marshburn knew of the Alabama law before his contract with Gordon, and concealed this fact from Gordon, and induced the latter to make these purchases without knowledge of this vice in the title, Marshburn neither paying nor obligating himself to pay any part of this purchase money, but only having interest in the profits after the return of the purchase money to the actual purchaser, notice to Marshburn under such circumstances would not be constructive notice to Gordon."

Under the construction we have given the court's charge, and the judgment following the charge, we think this proposition is purely abstract, and not in point on the facts of this case. The issue of notice to Gordon was raised independent of Marshburn's connection with the case, and resolved by the court against him.

[21] The verdict against Marshburn was not against the great weight and preponderance of the evidence. In addition to the facts given in the opinion of the Commission of Appeals, it was shown by credible witnesses on this trial that, before purchasing any of the apparent title, Marshburn had access to the files of the Houston Oil Company, and was thereby fully advised of the true title. And, further, two of the heirs under Cyrus Aiken testified that, before Marshburn purchased the apparent title, he tried to purchase their title, at which time they advised him that the heirs of Mildred Aiken had no title or interest in the land. Appellants controverted this testimony, but its credibility was for the jury.

[22] Under the opinion of the Commission of Appeals, there was another issue of notice to Gordon and Marshburn. It was said:

"The record in this case shows that the Houston Oil Company put a tenant on said land in 1913, and kept him there continuously to the time of the trial. It further shows that in 1916 said oil company was claiming the land under the heirs of Mildred Aiken, and that it was still claiming an interest in said lands under said heirs at the time of trial. Marshburn pur-

chased the interest in said land claimed by him under the heirs of Mildred Aiken prior to November 1, 1918. The trial was had in March, 1921. On said trial it was agreed that said oil company also held an interest in said land under the heirs of Cyrus S. Aiken. The date at which it acquired such interest is not shown by such agreement nor by the evidence, nor is it shown that it ever had or asserted any such claim prior to Marshburn's purchase. It is contended by defendants in error that the possession of said tenant was constructive notice of the basis of their claim to the superior title to said land. The burden being on defendants in error to show notice to Marshburn of the basis of their claim prior to his purchase, before he, under the facts above stated, could be considered lacking in diligence for failing to make inquiry of such tenant, it devolved on defendants in error to show that said oil company at that time held and claimed some interest in said land under the heirs of Cyrus S. Aiken."

It was agreed on this trial that the Houston Oil Company acquired the interest referred to by the Commission of Appeals on August 8, 1916, which was before appellants acquired any interest in the land. Therefore, under the proposition of law announced by the Commission of Appeals just quoted, the possession of the Houston Oil Company, through its tenant, was sufficient to raise the issue of notice against Marshburn and Gordon, as to all purchases made by them, which was resolved by the court against them. This disposes of the issues of good faith, in so far as appellants hold directly under the heirs of Mildred Aiken, since it was agreed that the other appellants, O. S. Parker and J. B. Hooks, acquired their interest with notice of all the rights of appellees.

[23] But they assert that they hold certain interests under a chain of thirteen deeds, named by them in their brief, in which they say their grantors were innocent holders of the Mildred Aiken title. Without giving these deeds in full, it is sufficient to say that they rest upon certain powers of attorney from the Mildred Aiken heirs, in which these attorneys in fact convey to certain attorneys at law an undivided interest for their services in adjusting the Mildred Aiken title. These parties, under whom appellants hold, are named in their following proposition:

"Under the decision of the Supreme Court in this case the burden of proof was upon the defendants to show that Johnson, McMurtray, Banks, Smith, and Crawford were bad-faith purchasers when their interest vested in them. There is no pretense that they made any proof in discharge of this burden. Therefore it is' established that Johnson, Banks, McMurtray, and Smith and Crawford were bona fide purchasers under their powers of attorney, and, being so, Marshburn (or rather Gordon, the real purchaser) is protected thereby.

"It has been held by the Supreme Court of Texas in the case of Garner v. Boyle, 97 Tex. 460, 79 S. W. 1066, that an attorney acquiring a contingent half interest, such as this was, is a bona fide purchaser even where the burden of proof is the reverse of the instant case."

Appellants support this proposition only by giving the nature of the instruments, that is, whether a deed or power of attorney, and the parties thereto. On the statement made by them and appellees' answer thereto their proposition is unsound, for the following reasons:

[24-26] As we understand the evidence, as analyzed by appellees—appellants give us no data on these issues—appellants' deeds from Percy O. Pointer, F. A. Hardin, James Hardin, Margaret Moody, John Hardin, Percy Hardin, and Eva Hardin convey no title, since they were not heirs of Mildred Aiken. Appellants claim to hold under W. A. Johnson, on the theory that he was an innocent purchaser. The issue was raised that, before they purchased from Judge Johnson, he was fully advised of the claim of appellees. In addition to that, the conveyance from Judge Johnson to Marshburn was of "his right, title, and claim," so Marshburn was not an innocent purchaser, under Cook v. Smith, 107 Tex. 119, 174 S. W. 1094, 3 A. L. R. 940; Threadgill v. Bickerstaff, 87 Tex. 520, 29 S. W. 757. Appellants acquired no interest as an innocent purchaser of the apparent title under their deed from Annie Harroun, since she was also an heir of William A. Aiken, and by this deed appellants acquired one-twelfth more of the real title than of the apparent title. Then, also, her deed conveyed only her "right, title, and interest" in the land. The same facts apply to the deed from T. B. Beck, E. L. Beck, and C. A. Hatch. Karl B. Kumpe's deed to Marshburn purported only to "remise, release, and forever quitclaim" his interest in the land, and therefore, under Cook v. Smith, supra, appellants are not innocent purchasers.

[27-29] Appellants cannot hold as innocent purchasers under the power of attorney from Mrs. McDougal and Mrs. Hatch to McMurtray, since Mrs. Hatch was a daughter of William Aiken, and this power of attorney conveyed more of the real title than of the apparent title. Mrs. McDougal's power of attorney was made long subsequent to the acquisition of the title by limitation by appellees' predecessors, and, in addition, her power of attorney conveyed only an undivided one-half interest in whatever might be recovered. It passed no title—merely a prospective interest in the future recovery. Under the authorities last cited, it was insufficient to make McMurtray an innocent purchaser. Appellants' claim to hold the interests of Lorena, Mattie, and Albert Banks under power of attorney to McMurtray. Appellees say that no such power of attorney is in the record, and, as this statement is not controverted by appellants, we accept it as true. But, had there been such power of attorney dated June 13, 1914, appellees' pred-

ecessors had already acquired title by limitation. But, as to all the interests held by appellants under McMurtray, it appears that he conveyed one-half his interest to J. A. Mooney and W. A. Johnson, under whom appellants hold. This contract does not provide for a present interest in the land, but McMurtray agrees to convey to them, at the termination of the litigation, "one-fourth undivided right, title, or interest in whatever land might be recovered." Under the authorities last cited, this was only a quitclaim deed, and could not support a claim of innocent purchaser. Then, as already said, long before appellants acquired the Johnson and Mooney claims, both these grantors had been fully advised of the claim of appellees.

[30, 31] Appellants refer to power of attorney from Lorena McMurtray to James B. Banks, dated June 5, 1918. Appellees say in reply that no such power of attorney is in the record. Appellees make the same statement as to a claimed power of attorney from Mrs. McDougal to Banks. Appellants also claim under a power attorney from Mattie Knight and others to Smith and Crawford, dated October 15, 1917. There could have been no innocent purchaser under this power of attorney, since appellees had acquired title by limitation long prior to this deed. Then, as already shown, they were in possession through their tenant at the time this power of attorney was executed. Also under the authorities above cited appellants could not be innocent purchasers under the language of this power of attorney which merely conveyed "an undivided one-third interest in and to such interest as we may be entitled to."

[32] The statement of facts in this case is a record of 780 pages. We have not gone beyond the statement of appellees as to the nature and recitations of the deeds under which appellants claim to hold as innocent purchasers, on the theory that they may have had notice themselves, but that their grantors were without notice. As appellants made no statement from these deeds, but rested their brief by giving the character of the instrument, the rules do not require us to go beyond the answer of appellees.

Garner v. Boyle, cited by appellants in their proposition last discussed, does not sustain their construction of the deeds upon which they rely, and is clearly distinguishable from Cook v. Smith and Threadgill v. Bickerstaff. In Garner v. Boyle the power of attorney purported to "grant, sell, alien, and convey a one-half interest in and to all those certain lots, tracts, or parcels of land located and situated in Texas belonging to the estate of L. N. Paschal." This instrument was a conveyance of the present one-half interest in the land, while the interest upon which appellants rely conveyed only an "undivided one-half interest in and to all lands recovered by virtue hereof." This was not a present interest, but a contingent interest, depending upon the result of a future recovery.

[33] Appellants would estop the Houston Oil Company by the following propositions:

"The Houston Oil Company and its privies in estate are estopped to deny the bona fides of the purchases by appellants under the undisputed evidence reflected by the agreed judgment in the McDougal case, and the contract for the acquisition of the Mildred Aiken title, and the case as to them is determinable wholly upon the agreed interests held under the agreement fixing the ratio of interests as 78 per cent. to the appellants and 22 per cent. to said appellees."

The facts under this proposition are that a judgment was entered in cause No. 3325 in the district court of Tyler county, Tex., wherein Mrs. E. S. McDougal and other heirs of Mrs. Aiken were parties on one side and the Houston Oil Company on the other, and in which other parties intervened. The McDougals and their associates and the Houston Oil Company pooled their interests, and agreed to hold the title on a fifty-fifty basis. In that suit they were successful against the interveners, and judgment was entered as per agreement. This judgment was followed by a written contract between the McDougals and their associates and the Houston Oil Company, wherein they agreed to hold the Mildred Aiken title on a fifty-fifty basis, and, also having discovered that they did not own all the Mildred Aiken title, agreed to acquire all outstanding interests under that title and hold it on that basis. They further agreed that "this obligation to contribute being expressly declared to be a burden upon and a convenant running with the land." These facts were pleaded by appellants as constituting estoppel by contract, and also an equitable estoppel. Under this plea, the judgment and contract were offered in evidence. It was also shown that appellants acquired and hold a part of the Mildred Aiken title owned by some of the heirs to that judgment and contract. It was shown, as already said, that appellants, in fact, acquired 78 per cent. of that title, and the Houston Oil Company 22 per cent. The issue was raised against appellants that in acquiring this title they were not misled, either by the judgment or contract, but acquired it knowing its invalidity, and that the Houston Oil Company was not claiming under it. The issue was also raised that the Houston Oil Company was not holding under the Mildred Aiken title, but against it. On the theory that appellants are the holders of the Mildred Aiken title, they did not offer to hold with the Houston Oil Company on the fifty-fifty basis established in the contract, but on a former appeal actually recovered 78 per cent. of that title. Appellants' proposition could only relate to the Houston Oil Company, which was awarded on this trial less than 700 acres of the land in controversy. It is our conclusion

that the facts pleaded and offered in evidence do not constitute an estoppel against the Houston Oil Company.

[34] (1) There was no equitable estoppel. Where the real owner does not mislead the purchaser to his injury, but it is made to appear that the purchaser has the same knowledge as the real owner, there can be no equitable estoppel. To constitute an equitable estoppel under the facts we have before us, the purchaser must be influenced to his injury by the conduct or representations of the owner. Here appellants were advised that the Houston Oil Company was not claiming under the Mildred Aiken title—that issue was raised against them—and that such title was of no value. Therefore there was no basis for equitable estoppel. Wortham v. Thompson, 81 Tex. 348, 16 S. W. 1059; Page v. Armin, 29 Tex. 71. This proposition is clearly stated by 21 C. J. 1131, where it is said that there can be no equitable estoppel, "where the truth is known to both parties or where both have equal means of knowledge," and the issue suggested by that proposition was clearly raised. It is not the proposition of appellants that the court erred in refusing to submit the issue of equitable estoppel, but that it was established as a matter of law. In this they are in error.

[35, 36] (2) Nor do the facts constitute an estoppel by contract. Appellants and appellees are not claiming mutual rights under a mutual contract. Appellants are not saying to the Houston Oil Company: "You agreed with our grantors to hold this title on a fifty-fifty basis, and now we demand our rights under the contract." On the contrary, they have repudiated the contract and claim to own 78 per cent. of the Mildred Aiken interest; when, under its terms, if the contract is to be enforced, they could not hold more than 50 per cent. Although under the Mildred Aiken title they are not asserting any affirmative property rights under this contract, that is, relying upon it as a link in their chain of title, yet they would invoke it as a basis of estoppel by contract. It is a complete answer to that proposition to say that, to form the basis of an estoppel, except in equity, the contract in all its terms must be invoked by one party against the other. Here appellants would repudiate all the substantive rights arising under the contract, that is, the enjoyment of the estate which it undertakes to partition, and would invoke only that part giving validity to the Mildred Aiken title. The proposition in this case could give rise only to an issue of equitable estoppel, which, for the reasons already given, does not appear as a matter of law, and we are not saying that the facts were sufficient even to raise it. As we understand the office of an "estoppel by contract," it is to preclude a party from taking inconsistent positions to another's prejudice. As said by 21 Corpus Juris, 110:

"If in making a contract, the parties agree upon or assume the existence of a particular fact as the basis of their negotiations, they are estopped to deny the fact so long as the contract stands, in the absence of fraud, accident, or mistake."

"So long as the contract stands," but here the contract relied upon as the basis of the judgment no longer "stands." Neither party is invoking it as the basis of their title to the land claimed in this case.

[37] (3) Immediately before the first trial, after the rights of all the parties had been fixed, the Houston Oil Company agreed, together with all the other parties to this litigation, that it at that time owned 22 per cent. of the Mildred Aiken title, and appellant owned 78 per cent. This agreement does not constitute an estoppel, because it clearly appears that it was intended only as a matter of evidence. This is made plain by other conditions of the agreement setting out the percentage of the real title owned by the different parties, and under this agreement appellants recovered 1,816 acres of the real title under the Cyrus Aiken heirs.

[38] (4) Appellants cannot defeat the title of the Houston Oil Company on the theory that, as their cotenant under the contract and judgment, it acquired an outstanding interest in the true title. This follows because appellants themselves acquired 1,816 acres of the true title, while the Houston Oil Company acquired less than 700 acres, and appellants have made no proposition to share their interest with the Houston Oil Company. While it is a general rule that a tenant in common cannot purchase an outstanding title or incumbrance and refuse to permit his cotenant to share in the benefits by bearing his part of the burden (Niday v. Cochran, 42 Tex. Civ. App. 292, 93 S. W. 1027), there are important exceptions to that rule, one of which is:

"If the title claimed in common is not merely defective, but is a nullity, either may buy the real title for himself alone." Niday v. Cochran, supra.

Here the Mildred Aiken title was an absolute nullity. Again, under the same authority, it is the rule:

"If the claimants * * * are yet asserting hostile claims against each other, the rule that the one may share in the result of the other's efforts for the protection of the common title does not apply."

And certainly Marshburn and the Houston Oil Company were asserting hostile claims to the land. Again, the Houston Oil Company and appellants acquired their respective titles by different instruments and at different times, that is, at the time appellants were purchasing their interests the Houston Oil Company held only under the McDougal judgment, while appellants held under transfers from the heirs. Rippetoe v. Dwyer, 49

Tex. 505; McFarlin v. Leaman (Tex. Civ. App.) 29 S. W. 44; Roberts v. Thorn, 25 Tex. 728, 78 Am. Dec. 552.

Concluding our discussion of this proposition, appellants can claim nothing, by way of estoppel by the judgment in the McDougal Case and the contract following it, that the plaintiffs in that case were not entitled to claim. There is nothing in the McDougal Case to show a recognition that the heirs of Mrs. Cyrus S. Aiken or that the heirs of the brothers and sister of Cyrus S. Aiken were the true owners, the agreement merely stating that whatever title any party to the judgment might have should be placed one-half in the plaintiff on the one hand and one-half in the defendant on the other. The Houston Oil Company acquired no other title, except its title under the judgment to any of the land in controversy until on April 18, 1919, over six months after Marshburn had made his last purchase, in September, 1918.

Any act or thing that the Houston Oil Company might have done could not have divested by estoppel title out of the heirs of Jane Love Aiken and John G. Aiken, under whom it holds, even had the Houston Oil Company been guilty of the grossest fraud toward Marshburn and the other appellants, and even had it attempted deliberately and willfully to deceive the appellants. Being the holders of the true title, the grantors of the Houston Oil Company had the right to sell this title on the market, and did so to the Houston Oil Company. As it was not estopped to buy this interest, and as appellants, as cotenants with the Houston Oil Company under the judgment and contract, have no right to share in the purchase, judgment was properly rendered for the Houston Oil Company.

On the exclusion and introduction of evidence, appellants advance the following propositions:

[39] (a) That the court erred in excluding certain letters and telegrams passed between W. D. Gordon and L. H. Marshburn during the month of May, 1919, on the ground that such letters and telegrams were admissible as a part of the res gestæ and as circumstances corroborating the testimony of Marshburn and Gordon upon the issue of notice of the law of Alabama as affecting this controversy. The facts of this proposition are that Gordon made a contract with Marshburn in 1917, after Marshburn had acquired a certain interest in the land, under which Gordon was to furnish the money, and Marshburn was to purchase the outstanding interests. Gordon testified that he knew nothing of the existence of the heirs of Cyrus S. Aiken, and did not know that under the law of Alabama this was the separate property of Cyrus S. Aiken and descended to his heirs. He said that this information came to him first in May, 1919, when he was served with interrogatories to the Chief Justice of the Supreme Court of Alabama to develop the law on these facts. After getting this information, he sent Marshburn to Alabama to investigate the claim of the true heirs of Cyrus S. Aiken, and the letters and telegrams offered passed between Marshburn and Gordon while Marshburn was on this trip. Appellants say:

"The telegrams and letters between Marshburn and W. D. Gordon were exchanged between Gordon and Marshburn while Marshburn was undertaking to negotiate a purchase from these witnesses, in 1919, and were a part of the transaction and are admissible as res gestæ, as circumstances in connection with the transaction to show when Marshburn and Gordon first acquired notice and knowledge of the Alabama law, and in corroboration of the facts testified to by them."

Citing Gilman v. Blum, 58 Tex. 630, Memphis v. Goode (Tex. Civ. App.) 171 S. W. 284, West Side Oil Co. v. McDorman (Tex. Civ. App.) 244 S. W. 182, and Independent Fruit Co. v. Platt (Tex. Civ. App.) 250 S. W. 1068, they say:

"In this state, when letters and telegrams are written in connection with a transaction and during the progress of the transaction, they are admissible as circumstances as part of the res gestæ."

Appellees answered this proposition by saying:

"Appellants have nowhere quoted the language or the substance of any letter or any telegram. * * * What was in any one of these letters? What was in any one of these telegrams? Appellants do not attempt to say."

[40] The duty rested upon appellants, which they did not meet, to show by a statement in their brief the substance of the excluded testimony. Smith v. Railway, 45 Tex. Civ. App. 81, 99 S. W. 564; Walker v. Railway, 51 Tex. Civ. App. 391, 112 S. W. 431; Manheim v. Clark (Tex. Civ. App.) 157 S. W. 291; Grand Lodge v. Dillard (Tex. Civ. App.) 162 S. W. 1173. But apart from that, even if appellants had made a proper statement, the evidence was properly excluded, since appellants' purchases were made before November 1, 1918. Nothing that Marshburn might say to Gordon or Gordon might say to Marshburn in May, 1919, six months after the last purchase, could affect the purchases or make appellants innocent purchasers of any of the land in controversy. These letters and telegrams were self-serving.

[41, 42] (b) Appellants say it was error in the trial court to permit appellees to read in evidence letters passing between the Houston Oil Company's general counsel at Sherman, Tex., and its general attorneys at Houston, Tex., and between these attorneys and sundry attorneys in the state of Alabama, with reference to the law of that state—all of which was objected to by appellants on

the ground that the evidence offered was pure and simple hearsay and self-serving, made in the absence of appellants, against whom these letters were offered and read in evidence. Appellees object to our considering this proposition, on the ground that the substance of the letters complained of is not given by appellants. This is a good objection: Stone v. Stitt, 56 Tex. Civ. App. 465, 121 S. W. 188; Evans v. Houston Oil Co. (Tex. Civ. App.) 211 S. W. 605; Morrison v. Hammack (Tex. Civ. App.) 152 S. W. 494. But an examination of the evidence complained of shows that it was admissible. The Commission of Appeals said:

"Before he can be charged with knowledge of the basis of the claim of said heirs and its consequent validity, it must appear that the inquiry suggested by the fact that the said heirs had theretofore asserted a claim to said land, if followed with reasonable diligence, would necessarily have led to actual knowledge of the basis and validity of such claim."

The evidence complained of was admissible to show that the Houston Oil Company and its attorneys knew the law of Alabama in relation to the facts of this case, and were in position, had inquiry been made of them, to advise Marshburn or the other interested parties as to the status of the true title.

[43] (c) Appellants also complain of the oral testimony of Judge Head, general counsel, and of other attorneys of the Houston Oil Company, to the effect that, had inquiry been made of them, they could and would have advised Marshburn of the status of the title to this property. In offering this testimony, appellants were doing nothing more than complying with the burden imposed upon them by the Commission of Appeals.

[44] Appellants say that appellees have failed to discharge the burden to establish what quantity of land in dispute was purchased mala fides, and, the burden being upon them to affirmatively prove what interest was so vitiated by bad faith, it was error to award them a judgment on such issue. In answering this proposition, without analyzing the facts, which would take many pages, we say the evidence clearly shows the apparent interest of each of the so-called heirs of Mrs. Cyrus S. Aiken, under whom appellants hold, and, since neither appellants nor any one from whom they hold were innocent purchasers of such interests, judgment was properly entered against appellants for all the land in controversy on this appeal.

[45, 46] In conclusion, appellants say the court committed error in submitting over their objections "issues 1, 2, 3, 4, 4A, 5, 6, 7, 8, and 9." The mere statement of this proposition shows that it is multifarious and requires no further review. Glover v. Railway (Tex. Civ. App.) 163 S. W. 1063; El Paso & S. W. Ry. Co. v. Goff (Tex. Civ. App.) 146 S.

W. 574; Riley v. Fisher (Tex. Civ. App.) 146 S. W. 582. And again, specifications of error submitted as propositions, without disclosing the point complained of, which this proposition does not do, cannot be considered. Anderson v. Crow (Tex. Civ. App.) 151 S. W. 1085; Hirsch v. Patton (Tex. Civ. App.) 108 S. W. 1018; Wirtz v. Railway (Tex. Civ. App.) 132 S. W. 513.

Finding no errors in the trial of this case, it is our order that the judgment of the trial court be, and the same is, hereby in all things affirmed.

HIGHTOWER, C. J., not sitting.

On Rehearing.

WALKER, J. On submission of this case, Mr. Chief Justice HIGHTOWER recused himself, and on motion of appellants has filed the following certificate, duly verified by him, explaining his action:

"When this cause was submitted in this court, on the 10th day of March, 1927, the writer had reached the conclusion that he was disqualified to sit in its disposition, and so held, and refused to sit. Thereupon the cause was submitted, and was thereafter decided and disposed of by the two associate justices of this court, Hon. Daniel Walker and Hon. W. B. O'Quinn, the writer taking no part in the discussion and disposition of the cause.

"Since the decision of this cause by the associate justices of this court, and pending the motion for rehearing, one of the attorneys for the appellants, Hon. W. D. Gordon, has requested me to cause to be entered upon the minutes of this court my reasons for holding myself disqualified to participate in the decision of this cause, and, complying with that request I make the following statement, which the clerk of this court will enter upon the minutes:

"During the year 1912 the law firm of Hightower, Orgain & Butler, of which firm I was the senior member, were general attorneys for the Houston Oil Company of Texas, and had active management of all the litigation in which the Houston Oil Company of Texas was involved throughout East Texas. During the latter part of August, 1912, a suit of trespass to try title was filed in the district court of Tyler county, Tex., by Adelaide A. Aiken and others against the Houston Oil Company of Texas to recover title and possession of the George T. W. Collins league of land. As I now recall, the plaintiffs in that cause were claiming the land as heirs of one John G. Aiken. At that time the Houston Oil Company claimed to own all of the George T. W. Collins league by fee-simple title, and, in due time after the filing of said suit against it, my firm prepared and filed the answer of the Houston Oil Company of Texas as codefendant in that cause, and continued to represent the Houston Oil Company of Texas in that cause as long as it remained on the docket of the district court, and until it was finally dismissed by the plaintiffs in that suit, some time in the year 1915. The writer, as the senior member of the firm of Hightower, Orgain & Butler, had active charge of said cause, and on several occasions appeared in the

district court with a view to trying the cause, and would have represented the Houston Oil Company of Texas as his client in that cause to final disposition had the case not been disposed of by dismissal.

"I am unable to state in detail the questions that were involved in the cause of Adelaide A. Aiken et al. v. Houston Oil Company of Texas above mentioned, but, as I now recall, there was no question of innocent purchase involved, but the Houston Oil Company of Texas was claiming the land both under record title and by limitation, and the writer made as thorough examination of the facts and law necessary to uphold the Houston Oil Company of Texas title as was possible at that time. In the present cause the same parties who were parties against the Houston Oil Company of Texas in the cause of Adelaide A. Aiken and others v. Houston Oil Company of Texas are now codefendants with the Houston Oil Company of Texas in this cause, the plaintiffs in which were not parties on either side in the former cause. At the time I held myself disqualified to sit in the disposition of the present cause by reason of having been of counsel for the defendant, Houston Oil Company of Texas, in the former cause. I was not absolutely sure that I was so disqualified, but I thought and felt that my sitting in this cause would be of doubtful propriety, and I think so still. It is true that upon the former appeal of this cause to this court I did sit in its disposition, but at the time I did so I had forgotten all about having been of counsel in the former suit above mentioned, and did not discover that I had been so of counsel until after the disposition by the Supreme Court of the writ of error granted in the former appeal.

"The clerk of this court is ordered and directed to enter upon the minutes of the court the above-stated reasons for holding myself disqualified to sit as a member of this court in the disposition of this cause. This 2d day of May, 1927."

On the theory that the facts thus found constitute a legal disqualification, appellants advance on this rehearing the following proposition:

"These appellants in the case at bar have been denied, by this tribunal, due process of law guaranteed to them by the Fourteenth Amendment of the Constitution of the United States and by the Constitution and laws of this state."

In their motion appellants recite the fact of the former appeal of this case, giving the result of the trial in the lower court, its decision in their favor, the extent of the interest recovered by them, the appeal by these appellees, our order reversing the case, and the judgment of the Supreme Court affirming our judgment of reversal. The facts on these issues are fully reflected in the reports of the former appeal cited, in our original opinion. Under the facts thus stated appellants advance the following additional proposition:

"The facts thus recited and hereunto verified by affidavit are submitted as establishing the want of power and jurisdiction of this honorable Court of Civil Appeals to enter the order which it did enter on the 1st appeal from the judgment of Judge Singleton, whereby that judgment was reversed and annulled, for that the disqualification of the Chief Justice to participate in that decision rendered the action of the court in reversing that judgment null and void, and all proceedings thereafter taken culminating in the attempted destruction of the judgment of the lower court first entered in this case are likewise null and void."

[47] Both these propositions must fall, since, as we understand the decisions of our courts, the facts certified to by Judge Hightower do not constitute a legal disqualification. He expressly found, and his finding is not challenged by appellants:

"In the present cause the same parties who were parties against the Houston Oil Company of Texas in the cause of Adelaide A. Aiken and others v. Houston Oil Company of Texas are now codefendants with the Houston Oil Company of Texas in this cause, the plaintiffs in which were not parties on either side in the former cause."

From this finding it appears that none of the appellants in the present case was a party to the suit in which he was of counsel. Therefore this is not the case in which he was of counsel, though the subject-matter of this litigation is the same as in that case. We think this finding makes this a case on all-fours with Glasscock v. Hughes, 55 Tex. 468, where it is said:

"The judge is prohibited from sitting to try a case 'where he shall have been of counsel in the case.' We do not think 'to have been connected as counsel at one period with the matters, or a portion of them, in litigation in this suit, * * *' was sufficient to disqualify him."

In Ruth v. Carter-Kelley Lumber Co., 286 S. W. 905, this court expressly recognized this distinction, saying: "The parties are not the same," citing "Taylor v. Williams, 26 Tex. 583; Glasscock v. Hughes, 55 Tex. 461; King v. Sapp, 66 Tex. 519, 2 S. W. 573; Cullen v. Drane & Son, 82 Tex. 484, 18 S. W. 590; Galveston & H. Investment Co. v. Grymes, 94 Tex. 609, 618, 63 S. W. 860, 64 S. W. 778; City of Austin v. Cahill, 99 Tex. 172, 201, 88 S. W. 542, 89 S. W. 552; Waters-Pierce Oil Co. v. Cook, 6 Tex. Civ. App. 573, 26 S. W. 96; Stockwell v. Glaspey (Tex. Civ. App.) 160 S. W. 1151."

[48] While the facts of this case do not constitute a legal disqualification, yet we agree with Mr. Chief Justice HIGHTOWER that they constituted a sufficient warrant for his act in recusing himself on motives of delicacy and propriety, as recognized by Mr. Chief Justice Gaines in Investment Co. v. Grymes, 94 Tex. 618, 63 S. W. 860, 64 S. W. 778.

[49] It is now the settled law of this state that a judgment rendered by two members of a Court of Civil Appeals, where the third

member is recused, is a valid judgment. City of Austin v. Nalle, 85 Tex. 520, 22 S. W. 668, 960.

The motion for rehearing is in all things overruled.